J-S12022-15

2015 PA Super 98

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TAM THANH NGYUEN, | |
| Appellant | No. 911 EDA 2014 |

Appeal from the Judgment of Sentence entered March 14, 2014
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0003833-2012

BEFORE:  BOWES, SHOGAN, and FITZGERALD,[*] JJ.

OPINION BY SHOGAN, J.:                          **FILED APRIL 27, 2015**

Appellant, Tam Thanh Ngyuen, appeals from the judgment of sentence entered following his conviction for possession with intent to deliver a controlled substance ("PWID").  For the reasons that follow, we vacate and remand.

The following findings of fact, as rendered by the trial court, are relevant to our analysis:

> 1.  On January 4, 2012, shortly after 3:00 a.m., Trooper Jared Bromberg, an officer with the Pennsylvania State Police, was on duty and working patrol along with Trooper Thomas O'Konski when he observed a black Mercedes traveling at a high rate of speed. N.T., 6/20/13, pp. 21-23. Trooper Bromberg was working the 11 P.M. to 7 A.M. shift that evening.  *Id.* at 20.

---

[*]  Former Justice specially assigned to the Superior Court.

2.    At approximately 3:15 A.M., as Trooper Bromberg was driving southbound on Interstate 95 (hereinafter "1-95"), the Mercedes drove past the troopers' patrol vehicle. *Id.* at 22. Upon observing the Mercedes, Trooper Bromberg "clocked" the speed of the vehicle by matching its speed for six tenths of a mile. *Id.* at 22. The Mercedes was traveling 73 MPH in a 55 MPH zone. *See* Commonwealth Exhibit, C-1, Affidavit of Probable Cause. Trooper Bromberg also observed the car following too closely. N.T., 6/20/13, p. 29.

3.    Trooper Bromberg was in full uniform and in a marked Pennsylvania State Police vehicle. *Id.* at 21.

4.    Trooper Bromberg activated his lights and siren in order to conduct a traffic stop of the vehicle. *Id.* at 22-23. The Mercedes pulled over onto the right shoulder of the road, between exits 7 and 8 on 1-95. *Id.* at 23.

5.    Trooper Bromberg, who has been with employed with the Pennsylvania State Police for about eight and half years, has had extensive police training in the detection of controlled substances. *Id.* at 17-18. Over the course of his career, Trooper Bromberg has been involved in hundreds of drug investigations, and has investigated controlled substances while on patrol approximately 250-300 times. *Id.* at 18. He has made approximately 150 stops along the 1-95 Corridor that have involved narcotics. *Id.* at 29.

6.    Following the stop, Trooper Bromberg approached the driver's side of the Mercedes along with Trooper O'Konski. *Id.* at 23. Trooper Bromberg identified himself to the driver and explained the reason for the stop. *Id.* at 24. After he obtained the driver's license and registration, he asked the driver to exit the vehicle. *Id.* at 24-25. The driver complied and stood at the rear of the vehicle per the trooper's request. The driver was not handcuffed. *Id.* at 26.

7.    Trooper Bromberg observed the driver "moving around excessively, "overtalking" and noticed that the driver was "overly apologetic" during the stop. *Id.* at 24, 29.

8. As Trooper Bromberg approached the driver's side of the vehicle, Trooper O'Konski approached the passenger side.

- 2 -

Trooper O'Konski stood at the right side of the vehicle without engaging the passenger. *Id.* at 25.

9. When the driver was asked to step to the rear of the vehicle, Trooper Bromberg then walked to the passenger side of the vehicle and asked the passenger, [Appellant] herein, for his driver's license. *Id.* at 26-27. [Appellant] refused to answer the trooper's questions and did not make eye contact. *Id.* at 27. Trooper Bromberg noted that in his experience, this type of behavior is consistent with narcotics activity discovered during traffic stops. [Appellant] eventually provided his information to Trooper Bromberg. *Id.*

10. Trooper Bromberg then returned to his vehicle and ran both the driver and [Appellant's] information through both NCIC and PENNDOT. *Id.* at 28. [Appellant] came back with "numerous prior drug arrests." *Id.* at 28.

11. Trooper Bromberg then returned to the Mercedes and issued a written warning for speeding and following too closely. *Id.* at 29. Trooper Bromberg returned the driver and [Appellant's] paperwork to them. *Id.* at 29-30.

12. Trooper Bromberg then told the driver that the traffic stop was complete and that he was free to go. *Id.* at 30. He told him "to be careful pulling away." *Id.*

13. The driver began walking back towards the front driver's seat of the Mercedes and the troopers walked towards their patrol vehicle. *Id.* at 30-31.

14. Before Trooper Bromberg entered the patrol car, he turned around and reengaged the driver. *Id.* at 31. He explained that he had approached his door and the driver had reached the front driver's side door to the Mercedes at this time. *Id.* at 31. He asked the driver if he could ask him some more questions, and the driver said yes. *Id.* at 31.

15. Trooper Bromberg asked the driver about his nervousness, and asked where he had been coming from. *Id.* at 31-32. He also asked about his relationship with [Appellant]. *Id.* The driver answered all of his questions. *Id.*

16. Trooper Bromberg then asked the driver for consent to search the vehicle and "all of its contents." *Id.* at 33. The driver gave consent. *Id.* at 34.

17. Trooper Bromberg did not use any threatening language or draw his gun during this time. The driver and [Appellant] were not handcuffed.

18. [Appellant] was asked to step out of the vehicle and was told that the driver had given consent to search the vehicle. *Id.* at 34.

19. [Appellant] did not make eye contact with Trooper Bromberg. Id. at 34. [Appellant] exited the vehicle after Trooper Bromberg made a second request. *Id.* 20.

20. When [Appellant] exited the vehicle, he stuck his hands in his pockets. *Id.* at 34. Trooper Bromberg asked [Appellant] to take his hands out of his pockets and keep his hands visible, and he complied. *Id.* at 34-35.

21. Trooper Bromberg asked [Appellant] if he had any weapons on him, and [Appellant] said no. *Id.* at 35.

22. Trooper Bromberg then asked [Appellant] if he could frisk him for officer safety. *Id.* at 35. [Appellant] said yes. *Id.*

23. Trooper Bromberg frisked [Appellant] by checking his waist, then his pant pocket area. *Id.* at 35. Upon frisking [Appellant], Trooper Bromberg felt a cell phone in his pocket. *Id.* at 39. He asked [Appellant] what the object was and [Appellant] replied that it was a cell phone. *Id.* When Trooper Bromberg felt [Appellant's] right rear pocket, he felt a large amount of cash. *Id.* When he asked [Appellant] what it was that he felt, [Appellant] replied that it was cash. *Id.*

24. In [Appellant's] right front pocket, Trooper Bromberg felt a "soft package" that based upon his experience and training, he believed was bagged pills. *Id.* at 39-40. He asked [Appellant] what the object was and [Appellant] said "OxyContin." *Id.* at 40.

25. Trooper Bromberg ordered [Appellant] to take the package out of his pocket, and [Appellant] complied. *Id.* at 42.

26. When [Appellant] removed the item from his pocket, Trooper Bromberg observed "clear, small Ziploc baggies." *Id.* at 42. He was familiar with these bags from past arrests for narcotics and acknowledged that they are commonly referred to as coin bags. *Id.* Trooper Bromberg had seen these types of bags hundreds of times before. *Id.* at 42-43.

27. Trooper Bromberg then handcuffed [Appellant] and placed him under arrest. *Id.* at 43.

28. A search incident to arrest was performed and three bundles of cash held together with a rubber band, a cell phone, four bags of cocaine, and four jars of crack cocaine were recovered from [Appellant's] person. *Id.* at 43. The amount of cash recovered amounted to $1058.20. *Id.* at 43-44. Trooper Bromberg immediately recognized the substance in the jars to be crack cocaine, based upon past arrests. *Id.* at 43.

29. The court found the testimony of Trooper Bromberg to be credible.

Trial Court Opinion, 8/21/14, at 3-6.

Appellant was arrested and charged with PWID,[1] possession of a controlled substance,[2] and possession of drug paraphernalia.[3] Prior to trial, Appellant filed a motion to suppress evidence, which the trial court denied after conducting a suppression hearing.

Following a bench trial, Appellant was convicted of PWID. At the conclusion of trial, Appellant waived his right to a presentence report and

_____

[1] 35 P.S. § 780-113(a)(30).

[2] 35 P.S. § 780-113(a)(16).

[3] 35 P.S. § 780-113(a)(32).

asked the trial court to proceed to sentencing. Appellant was sentenced to the mandatory minimum sentence of thirty-six to seventy-two months.

Appellant filed a timely notice of appeal on March 25, 2014. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement and Appellant timely complied. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

Appellant presents the following issues for our review:

1. Whether the lower court abused its discretion in denying motion to suppress physical evidence, where Appellant's consent to submit to Terry v. Ohio pat down for weapons was coerced, during the course of illegal detention that was wholly unsupported by reasonable suspicion that Appellant was engaged in criminal activity or articulable suspicion that Appellant was armed and dangerous, which violated Appellant's right to a fair search and seizure under the Fourth Amendment, and Article 1, Section 8 of the Pennsylvania State Constitution?

2. Whether the lower court abused its discretion in denying motion to suppress physical evidence, where police exceeded scope of Terry stop, by conducting invasive search for contraband, without reasonable suspicion and after ascertaining that Appellant was not armed and dangerous, which violated Appellant's constitutional right to a fair search and seizure under the Fourth Amendment and Article 1, Section 8 of the Pennsylvania State Constitution?

3. Whether the lower court abused its discretion in denying motion to suppress incriminating statement, where police elicited statement during custodial interrogation, without advising Appellant of his Miranda Rights, which violated Appellant's constitutional right against self-incrimination under the Fifth Amendment and Article 1, Section 9 of the Pennsylvania State Constitution?

4. Whether Appellant was denied a fair suppression hearing, where Commonwealth presented evidence of 1) Appellant's consent to submit to pat down and 2) Appellant's verbal

admission to possessing Oxycontin, without apprising Appellant of such evidence, through police affidavits or other discoverable paper work, prior to the commencement of the suppression hearing?

5. Whether the mandatory minimum sentence of three (3) to six (6) years imposed by the trial court should be vacated, where the Superior Court, in **Commonwealth v. Newman** held that Pennsylvania mandatory minimum sentencing statutes no longer pass constitutional muster, pursuant to the United State Supreme Court holding in **Alleyne v. United States**, that mandatory minimum sentencing statutes are unconstitutional because they permit the trial court, to increase a defendant's minimum based upon a preponderance of the evidence, rather than a jury beyond a reasonable doubt?

Appellant's Brief at 5-6.

In his first issue, Appellant argues that the trial court abused its discretion in denying the motion to suppress physical evidence because the **Terry**[4] pat-down occurred during the course of an illegal detention unsupported by reasonable suspicion. Appellant's Brief at 13. Appellant maintains that the Trooper's redirection to Appellant to exit the vehicle, after concluding the initial traffic stop and advising the parties they were free to leave, was a new interaction requiring an independent showing of reasonable suspicion that criminal activity was afoot or that Appellant was armed and dangerous. **Id.** at 18. Accordingly, Appellant argues, because the Trooper did not have reasonable suspicion justifying the second interaction, all

_____

[4] **Terry v. Ohio**, 392 U.S. 1, 30 (1968).

evidence recovered incident and subsequent to the ***Terry*** pat-down should be suppressed as fruit of the poisonous tree. ***Id.***

The standard of review an appellate court applies when considering an order denying a suppression motion is well established. An appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. ***Commonwealth v. Russo***, 934 A.2d 1199, 1203 (Pa. 2007) (citing ***Commonwealth v. Boczkowski***, 846 A.2d 75 (Pa. 2004)). Where the record supports the factual findings of the trial court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. ***Id***. However, it is also well settled that the appellate court is not bound by the suppression court's conclusions of law. ***Id***. (citing ***Commonwealth v. Duncan***, 817 A.2d 455 (Pa. 2003)).

> With respect to factual findings, we are mindful that it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented. However, where the factual determinations made by the suppression court are not supported by the evidence, we may reject those findings. Only factual findings which are supported by the record are binding upon this [C]ourt.

***Commonwealth v. Benton***, 655 A.2d 1030, 1032 (Pa. Super. 1995) (citations omitted). In addition, we are aware that questions of the admission and exclusion of evidence are within the sound discretion of the

trial court and will not be reversed on appeal absent an abuse of discretion. ***Commonwealth v. Freidl***, 834 A.2d 638, 641 (Pa. Super. 2003).

"'Interaction' between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained." ***Commonwealth v. DeHart***, 745 A.2d 633, 636 (Pa. Super. 2000). The three levels of interaction are: mere encounter, investigative detention, and custodial detention. ***Id.***

> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.
>
> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

***Id.*** (internal citations and quotation marks omitted).

> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, this Court must make an objective inquiry, namely, whether the facts available to the officer at the moment of the [intrusion] warrant a man of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Plante*, 914 A.2d 916, 922 (Pa. Super. 2006) (internal citations and quotations omitted).

"To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved." *Commonwealth v. Reppert*, 814 A.2d 1196, 1201 (Pa. Super. 2002).

> To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Id.* at 1201-1202 (internal citations and quotations omitted).

More specifically, our Supreme Court has had the opportunity to address investigative detentions in the context of motor vehicle traffic stops. In *Commonwealth v. Freeman*, 757 A.2d 903 (Pa. 2000), a Pennsylvania State Police trooper noticed two vehicles traveling fairly close together, switching lanes and jockeying for position as if in a "cat and mouse" fashion. *Id.* at 904. The trooper stopped one of the vehicles, which was driven by Diana Freeman ("Freeman"), while another officer stopped the second vehicle. *Id.* Freeman's vehicle contained two passengers. *Id.* When the trooper asked Freeman if she was lost or having a problem with the other driver, she explained that she had entered the wrong lane and had

maneuvered to the left lane to continue west on Interstate 80. *Id.* She also denied traveling with the other vehicle. *Id.*

While conducting a radio check of Freeman's driver's license and registration card, the trooper learned from another trooper that the occupants of the other vehicle contradicted Freeman by stating that the two vehicles were traveling together and further explained that they were following Freeman's car because it was having some type of engine problem. *Freeman*, 757 A.2d at 905. Returning to Freeman's car, the trooper gave Freeman a written warning, returned her license and registration card, and informed her that she was free to leave. *Id.*

The trooper went back to his patrol car but then returned to Freeman's vehicle and again asked whether Freeman was traveling with the second car. *Freeman*, 757 A.2d at 905. When she replied that she was not, the trooper informed her that the occupants of the second car had said otherwise, and he asked her to get out of the vehicle. *Id.* Freeman did so and walked to the rear of the car. *Id.* At this point, the trooper asked Freeman for consent to search her vehicle, which Freeman granted. *Id.* The ensuing search of the vehicle resulted in the discovery of five bags of marijuana. *Id.*

Freeman and her passengers were charged with possession of a controlled substance and possession with intent to deliver. *Freeman*, 757 A.2d at 906. Freeman filed a motion to suppress, which was denied. *Id.* After being convicted, appeals were filed by the Commonwealth and

- 11 -

Freeman. *Id.* Freeman's appeal centered on the failure to suppress and was based upon the argument that her consent to a search of the vehicle had been tainted by an illegal detention. *Id.* As the initial stop was deemed lawful, the question was whether there had been, in the interaction between Freeman and the police officer, a "second" detention that was illegal, thereby rendering the granted consent invalid. *Id.* Our Supreme Court concluded that the "second" round of questioning constituted a seizure, commenting that:

> The transition to and character of the subsequent interaction, however, supports the conclusion that Freeman was subject to a second seizure. Since the trooper had accomplished the purpose of the stop, as he expressly indicated, Freeman would have been entirely within her rights to drive away at that point. Nevertheless, the trooper's subsequent actions were inconsistent with his statement to Freeman that she was free to leave, as he: returned to Freeman's vehicle; questioned her about the second vehicle; pointed out the inconsistent statements from the vehicle's occupants when she denied traveling with that vehicle; and, ultimately and most significantly, asked her to step out of the vehicle prior to the request for consent. … Moreover, given everything that had come before, although these events occurred after express conferral of advice that Freeman was free to depart, they would have suggested to a reasonable person that such advice was no longer operative.

*Id.* at 907-908.

In **Commonwealth v. Moyer**, 954 A.2d 659 (Pa. Super. 2008), (*en banc*), this Court was faced with a traffic stop encounter featuring a "second" round of questioning and also concluded that the additional questioning constituted a seizure. There, Moyer's vehicle was stopped by

two Pennsylvania State Police troopers when it was observed that the vehicle's taillight had a hole in it. *Id.* at 661. One of the troopers also observed movement within the vehicle near the passenger side floor area. *Id.* After approaching the vehicle, the trooper explained the reason for the stop and obtained Moyer's license and registration. *Id.* A check of Moyer's background, prompted by the fact that he had bloodshot eyes and acted nervous, revealed a previous arrest involving marijuana possession. *Id.* at 661-662. A written warning for the taillight violation was prepared, after which the officer returned to the vehicle and directed Moyer out of the vehicle, showed Moyer the issue with the taillight and told him to have it repaired. *Id.* at 662. The trooper then handed Moyer the warning card and told him he was free to leave. *Id.*

However, as Moyer reached the driver's door of his vehicle, the trooper called out Moyer's name and asked him if he minded answering a few questions. *Moyer*, 954 A.2d at 662. Moyer was then confronted with the information regarding his prior arrest and the trooper's observation of movement in the vehicle. *Id.* The trooper then asked Moyer if there were any drugs or paraphernalia in the car. *Id.* When Moyer responded negatively, the trooper asked him if there were any drugs or paraphernalia on his person. *Id.* Moyer again responded negatively, prompting the trooper to ask if he could check the vehicle to make sure. *Id.* The trooper did not inform Moyer that he could refuse the request, and Moyer then

consented. *Id.* The ensuing search produced two crack pipes, leading Moyer to admit that he had consumed crack previously. *Id.*

Upon these facts, we concluded that Moyer had been subjected to a subsequent custodial interrogation. *Moyer*, 954 A.2d at 668. In making this assessment, we noted:

> when an individual has been subjected to a valid detention and the police continue to engage that person in conversation, the citizen, having been in official detention, is **less likely** to understand that he has the right to refuse to answer questions or a search. Furthermore, … the Court stressed that "conferral of the 'free-to-go' advice is, itself not a reason to forego a totality assessment" and therefore does not constitute a controlling factor in assessing whether a person would actually credit a police indication that he was free to leave.

*Id.* at 665 (emphasis in original) (citing *Commonwealth v. Strickler*, 757 A.2d 884, 899 n.24 (Pa. 2000)).

In the case *sub judice*, Appellant does not dispute the validity of the initial traffic stop. It appears that the trooper appropriately effectuated the stop based upon the motor vehicle code violations he observed. After ending the interaction based on the traffic violation, however, Trooper Bromberg initiated a second round of questioning with the driver. Thus, the question becomes whether this second interaction constituted a seizure and whether that subsequent seizure was supported by reasonable suspicion. *Moyer*, 954 A.2d at 665.

Trooper Bromberg provided the following testimony regarding his re-engagement of the driver. Trooper Bromberg testified that after issuing the

- 14 -

warning, the driver "thanked me.  Again, he was very apologetic and was, as I was explaining, was over-talking, which is nervousness."  N.T., 6/20/13, at 29.  Trooper Bromberg referenced the following exchange with the driver after re-engaging him:

> I asked him if I can ask him a few questions.  He related yes.  I asked him about his nervousness, about him being very apologetic, about moving around outside of the vehicle, how he knew the passenger, where they were coming from.

*Id.* at 31-32.

When asked on cross-examination why he re-engaged the driver after issuing the warning and walking back to his cruiser, Trooper Bromberg testified:  "I took the totality of the circumstances of the driver's behavior, the passenger's behavior, and the passenger's rap sheet."  *Id.* at 51.  Trooper Bromberg agreed with Appellant's counsel that he possessed the information regarding Appellant's criminal record after running the driver's and Appellant's information and **before** ending the interaction based on the initial traffic violation.  *Id.*  Thus, when again asked why he re-engaged the driver, Trooper Bromberg testified that "before I could ask for a consent to search, the driver has to feel free to leave."  *Id.* at 52.  Explaining further, he stated:  "Before the driver was – in order to get consent, I had to turn it into a mere encounter."  *Id.*  Trooper Bromberg provided the following additional testimony regarding this second round of questioning:

> [Appellant's counsel]:  I thought you told His Honor that my – the individuals were free to leave when you told them you were giving them a warning.

- 15 -

[Trooper Bromberg]:    To end the traffic stop.

[Appellant's counsel]:    To end the traffic stop.

[Trooper Bromberg]:    Correct.

[Appellant's counsel]:    But in your mind, they weren't really free to leave because you were going to reengage.  Weren't you?

[Trooper Bromberg]:    I made the decision, after I told them they were free to go, that I was going to reengage him and ask him questions.

[Appellant's counsel]:    And that was pre-meditated for legal reasons.  Yes?

[Trooper Bromberg]:    Yes.

N.T., 6/20/13, at 53.

Given the facts surrounding the subsequent interaction, we conclude that the driver and Appellant were subject to a second seizure.  As noted, the driver and Appellant were stopped for a lawful detention resulting from the motor vehicle code violations.  Because the trooper had accomplished the purpose of the stop, as indicated by his issuance of a warning and stating that the driver and Appellant were free to go, the driver would have been within his rights to drive away at that point.  Nevertheless, the trooper's subsequent actions were inconsistent with his statement that they were free to leave.  After walking toward his cruiser, the trooper turned around and returned to the driver's vehicle, approached the driver, and began to ask the driver additional questions.  Moreover, when the trooper re-engaged the driver, the driver was still standing outside of his vehicle.

N.T., 6/20/13, at 73. As this Court has noted, when a person is standing outside rather than inside his vehicle, he is less likely to believe that he can actually leave the area by entering the car and driving away. *Commonwealth v. Kemp*, 961 A.2d 1247, 1254 (Pa. Super. 2008) (citing *Moyer*, 954 A.2d at 659).

Thus, even though the trooper advised the driver and Appellant that they were free to leave, the trooper's actions would suggest to a reasonable person that such advice was no longer operative. *Freeman*, 757 A.2d at 908. Indeed, the trooper testified that it was his intention to re-engage the driver after ending the initial traffic violation stop. As such, we cannot conclude that a reasonable person would feel free to leave the scene. As noted previously, "when an individual has been subjected to a valid detention and the police continue to engage that person in conversation, the citizen, having been in official detention, is less likely to understand that he has the right to refuse to answer questions or a search." *Moyer*, 954 A.2d at 665. Thus, we conclude that the driver and Appellant were not involved in a mere encounter with the troopers at that point, but instead were subjected to a second investigative detention. *See Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa. Super. 2005) ("[W]here the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest.").

Accordingly, for this investigative detention to pass constitutional muster, it must be supported by reasonable suspicion of criminal activity. *Kemp*, 961 A.2d at 1254. "Where the investigative detention at issue follows a lawful traffic stop, the officer must demonstrate cause for suspicion after the end of the initial stop, and independent of any basis on which he conducted the prior stop." *Jones*, 874 A.2d at 117.

Here, the trooper identified the fact that the driver was overly apologetic, nervous, and talkative as reasons to re-engage the driver.

> In [*Commonwealth v.*] *Sierra*[, 723 A.2d 644 (Pa. 1999)] and *DeHart*, our Courts pronounced an officer's assessment of nervous demeanor palpably insufficient to establish reasonable suspicion of a citizen's involvement in criminal activity, even when viewed in combination with other indicia of potential criminal acts. We have found furtive movements similarly deficient even when they occur in high crime environments in the late hours of the night. Thus, we find no basis to conclude that excessive nervousness and furtive movements, even considered together, give rise to reasonable suspicion of criminal activity. A police officer's observation of a citizen's nervous demeanor and furtive movements, without more, establishes nothing more than a "hunch," employing speculation about the citizen's motive in the place of fact. Were we to validate such a practice, we would open every occupant of a motor vehicle in this Commonwealth to law enforcement officers' wholly subjective interpretation of inoffensive conduct, and undermine our Supreme Court's time-honored insistence that police officers may stop our citizens only on the basis of objective criteria. This we cannot do. This we will not do.

*Reppert*, 814 A.2d at 1206 (some internal citations omitted).

Thus, we conclude that the driver's behavior of being overly apologetic or nervous is insufficient to establish reasonable suspicion. Additionally, Trooper Bromberg possessed the information regarding Appellant's criminal

- 18 -

history prior to ending the initial stop based on the traffic violation. Accordingly, such information could not serve as the basis of reasonable suspicion for the subsequent interaction after the initial stop ended. Moreover, as previously noted, Trooper Bromberg testified to having the intention of re-engaging the driver after ending the initial traffic violation stop with the hopes of turning that interaction into a mere encounter. Thus, we cannot conclude that the Trooper had reasonable suspicion to justify the second investigative detention.

Additionally, we find no validity to any argument that the subsequent search of the vehicle was voluntary. When a consensual search is preceded by an illegal detention, "the government must prove not only the voluntariness of the consent under the totality of the circumstances, but ... must also establish a break in the causal connection between the illegality and the evidence thereby obtained." *Commonwealth v. Sierra*, 723 A.2d 644, 647-648 (Pa. 1999). In determining whether the consent has been vitiated by the taint of the preceding illegal detention, the reviewing court must consider: "(1) the temporal proximity of the illegal detention [and the defendants' consent]; (2) the presence of intervening factors between the two events; and (3) the circumstances surrounding, and the nature of, the official misconduct." *Id.* at 648 (brackets in original).

Under the facts of the present case, there was insufficient attenuation between the consent and the illegal detention to purge the taint of the

Trooper's unlawful conduct. The driver consented to the search only moments after the Trooper re-initiated questioning. Moreover, there were no intervening circumstances that would have diminished the coercive atmosphere of the illegal detention or otherwise justified the search. Finally, as previously noted, at the time the driver offered to allow the search, the vehicle was surrounded by two troopers, and Trooper Bromberg had just repeated his questioning regarding the driver's excessive nervous and apologetic demeanor. Under such circumstances, the driver's consent was tainted by the officer's conduct and was therefore ineffective to justify the search. *Sierra*, 723 A.2d at 648.

Because the officers lacked reasonable suspicion to support the detention and the driver's consent was tainted, the officers had no authority to search the car. Therefore, they had no justification for ordering Appellant out of the vehicle pursuant to the search and subsequently patting him down. As a result, the evidence seized during the pat-down search should have been suppressed. Thus, we are constrained to conclude that the court erred in denying Appellant's motion to suppress.[5]

Judgment of sentence vacated and order denying Appellant's suppression motion reversed. Case remanded for a new trial. Jurisdiction relinquished.

_____

[5] Due to our resolution of Appellant's first issue, we need not address Appellant's remaining claims raised on appeal.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/27/2015