**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BARBARA DISANTIS | |
| Appellant | No. 3608 EDA 2014 |

Appeal from the Judgment of Sentence November 17, 2014
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0005464-2014

BEFORE:  ALLEN, J., MUNDY, J., and FITZGERALD, J.[*]

MEMORANDUM BY MUNDY, J.:                    **FILED AUGUST 24, 2015**

Appellant, Barbara DiSantis, appeals from the November 17, 2014 judgment of sentence of 12 months' probation imposed following her convictions for possession of a controlled substance and possession of drug paraphernalia.[1]  After careful review, we vacate Appellant's judgment of sentence, reverse and remand.

The trial court summarized the relevant factual background of this case in the following manner.

> On May 18, 2014, Trooper Lee Nolan of the Pennsylvania State Police, while in full uniform with a marked patrol vehicle, initiated a traffic stop on a

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 35 Pa.C.S. §§ 780-113(a)(16) and (a)(32), respectively.

black Pontiac sedan for a traffic violation in Bristol Township, Bucks County. Trooper Nolan observed an extinguished brake light on a black Pontiac sedan while it was traveling on I-95 northbound. In order to conduct the stop at a safe location, Trooper Nolan stopped the vehicle 700 yards down off 413 in Bristol Township. Trooper Nolan then approached the vehicle and observed five (5) occupants in the vehicle. As Trooper Nolan approached the vehicle[,] he observed [Appellant] seated behind the driver of the vehicle. Trooper Nolan observed that [Appellant] had puffy hands that appeared to have track marks on them, which from his experience is consistent with drug use.

Trooper Nolan requested that the driver step outside the vehicle, and she complied. As the driver stepped outside, Trooper Nolan observed an extremely small black rubber band, which is consistent with putting heroin packets together, located in plain view on the floor of the vehicle by the driver. Trooper Nolan then showed the driver her brake light was out and explained the reason for the stop. The driver gave Trooper Nolan her license, registration and insurance card.

After running the vehicle registration, Trooper Nolan approached the passengers of the vehicle on the passenger's side and began to speak with them. The passengers appeared to be extremely nervous while speaking with Trooper Nolan. Trooper Nolan then requested the identifications from the vehicle occupants, who complied with his request[, and the driver returned to her vehicle]. Trooper Nolan ran the driver and vehicle occupants through CLEAN/NCIC, to obtain their driver's record. When Trooper Nolan ran [Appellant's] identification, it showed that she had warrants from Florida for probation violations in reference to drugs. Additionally, Trooper Nolan ran the criminal history of the driver and all the occupants of the vehicle.

Trooper Nolan prepared a written warning to the driver for the extinguished br[ake] light. Trooper

- 2 -

Nolan then approached the driver's side of the vehicle and spoke with the driver and requested that she step outside the vehicle. After the driver exited the vehicle, Trooper Nolan explained to the driver that he was issuing her a warning for the brake light and handed her the warning, her registration, her license and her insurance card. After returning all the driver's documentation to her, Trooper Nolan instructed the driver that she was free to leave.

After instructing the driver that she was free to leave, the driver turned around, and walked towards her vehicle, while Trooper Nolan took several steps towards his vehicle. After taking several steps, Trooper Nolan turned around and asked the driver if she had a few minutes. After acknowledging that she had a few minutes, the driver turned around and walked towards Trooper Nolan.

Trooper Nolan then asked the driver if there was anything in the vehicle, and explained to her the items that he saw inside the vehicle that led him to be suspicious that there might be something inside the vehicle, such as the rubber band and the marks on [Appellant's] hands. The driver stated that there was nothing in the vehicle. The driver then gave Trooper Nolan verbal and written consent to search the vehicle. After the driver signed the written consent form allowing the search, Trooper Nolan approached the vehicle, and so he was going to perform a search.

At the time Trooper Nolan requested to search the driver's vehicle, his patrol car was parked behind the driver's vehicle, with his lights on. Trooper Nolan was parked on an angle, so the driver could have driven away without moving his vehicle. He did not yell at the driver or the vehicle occupants or brandish his gun. There were two additional officers on scene, located several yards away from Trooper Nolan, behind his patrol vehicle, who were not speaking with the driver or any of the vehicle occupants at this time.

After receiving verbal and written consent to search the vehicle, Trooper Nolan had the passengers exit the two[-]door vehicle one by one. Trooper Nolan asked if there was anything[,] weapons of contraband[,] on anyone's person. As the occupants exited the vehicle, Trooper Nolan patted the occupants down for weapons. While [Appellant] was exiting the backseat of the vehicle[,] she handed her cigarette pack to Trooper Nolan. Trooper Nolan opened the cigarette pack, to make sure there were no weapons in the package, because he was planning on handing her cigarettes back to her while he searched the vehicle. Trooper Nolan observed that the cigarette packet contained three packets of suspected heroin, later confirmed as heroin. After Trooper Nolan secured the heroin in his patrol vehicle[,] he continued to search the vehicle and recovered contraband from where [Appellant] had been sitting.

Trial Court Opinion, 3/20/15, at 1-4 (citations and footnotes omitted).

The Commonwealth, by criminal information, charged Appellant with the aforementioned offenses on October 9, 2014. On October 30, 2014, Appellant filed a motion to suppress seeking suppression of all evidence, averring she was subject to an unlawful investigative detention and challenging the consent to search. Appellant's Omnibus Pre-Trial Motion, 10/30/14, at ¶¶ 9-12. The trial court held a suppression hearing on November 17, 2014. At the conclusion of the hearing, the trial court denied Appellant's motion, and Appellant proceeded immediately to a stipulated bench trial N.T., 11/17/14, at 71-72. The trial court found Appellant guilty of possession of a controlled substance and possession of drug paraphernalia

and sentenced Appellant to 12 months' probation. *Id.* 79, 85.[2] On December 15, 2014, Appellant filed a timely notice of appeal.[3]

On appeal, Appellant raises the following issues for our consideration.

> A. Whether the trial court erred in failing to suppress evidence seized from a vehicle where Appellant was a passenger because the consent to search the vehicle was tainted by an illegal detention?
>
> B. Whether the trial court erred in failing to suppress evidence located in Appellant's cigarette package when the state trooper conducted a warrantless search of the cigarette package without Appellant's consent?
>
> C. Whether the trial court erred in finding Appellant did not have a privacy interest in the vehicle and the cigarette package that was located on Appellant's person?

Appellant's Brief at 4.

We begin by noting our well-established standard of review over challenges to the denial of suppression motions.

> We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound

---

[2] Specifically, the trial court imposed the 12-month probationary sentence for Appellant's conviction of possession of a controlled substance and imposed no further penalty on her conviction for possession of drug paraphernalia. N.T., 11/17/14, at 85.

[3] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

*Commonwealth v. Gary*, 91 A.3d 102, 106 (Pa. 2014) (citation omitted).

In Appellant's first issue on appeal, she argues that the trial court erred in denying her motion to suppress because the consent to search the vehicle was preceded by an illegal investigative detention of the occupants of the vehicle. Appellant's Brief at 10. Therefore, she argues, because the consent was obtained as a result of the unlawful detention, the evidence should have been suppressed. *Id.* Importantly, Appellant does not dispute the validity of the initial vehicle stop. *See* Appellant's Brief at 6 (noting Trooper Nolan conducted a vehicle stop because the vehicle's taillight was broken); *See also* N.T., 11/17/14, at 7 (Appellant's counsel informing the trial court, "[w]e are not disputing the initial traffic stop"). Rather, Appellant claims the illegal detention occurred when Trooper Nolan "reengaged the driver seconds after telling her she was free to leave." Appellant's Brief at 13-14 (citation omitted). The Commonwealth counters by arguing that the driver was engaged in a mere encounter with Trooper Nolan because "there was a clear separation between the initial detention of the valid traffic stop and the second encounter where consent was given." Commonwealth Brief at 16. In the alternative, the Commonwealth argues that the facts and circumstances, as they appeared to Trooper Nolan following the initial traffic stop, gave rise to reasonable suspicion of criminal activity. *Id.* at 21-23.

Accordingly, we begin our analysis by determining the nature of the second encounter between Trooper Nolan and the driver.[4]

The Fourth Amendment of the United States Constitution guarantees that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…." U.S. Const. amend IV. Similarly, the Pennsylvania Constitution assures citizens of our Commonwealth that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures…." Pa. Const. art. I, § 8. The protection afforded by the Fourth Amendment against unreasonable searches and seizures extends to those encounters entailing only a brief detention. *Commonwealth v. Strickler*, 757 A.2d 884, 888 (Pa. 2000). In analyzing the constitutionality of an interaction between citizens and law enforcement, we first assess into which of three categories of interaction the challenged encounter falls.

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative

---

[4] Appellant was not the driver of the vehicle; however, "[a] traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (citation omitted). In the instant case, the second encounter between Trooper Nolan and the driver occurred prior to her returning to her vehicle and immediately following the initial traffic stop. Accordingly, it is necessary to determine the constitutionality of this encounter, as the occupants' Fourth Amendment rights are implicated.

detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Fleet***, 114 A.3d 840, 844 (Pa. Super. 2015) (citation omitted).

As noted, Appellant argues she was subjected to an investigative detention without the requisite reasonable suspicion based on Trooper Nolan's "reengaging" the driver of the vehicle in which she was an occupant, while the Commonwealth contends such interaction with the driver was a mere encounter or an otherwise constitutional investigative detention. ***See*** Appellant's Brief at 10; Commonwealth Brief at 21-23. When analyzing whether an interaction escalates from a mere encounter to an investigative detention, we employ the following standard.

> To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa. Super. 2012) (citation omitted), *appeal denied*, 65 A.3d 413 (Pa. 2013). In the specific context of a police-citizen interaction following the conclusion of a valid traffic stop, several considerations inform our analysis, including the following.

> A non-exclusive list of factors to be used in assessing whether police conducted a mere encounter after completion of a traffic stop includes: 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, … thus suggesting to a citizen that his movements may remain subject to police restraint; 9) the presence of an express admonition to the effect that the citizen-subject is free to depart is a potent, objective factor; and 10) whether the citizen has been informed that he is not required to consent to the search.

*Commonwealth v. Moyer*, 954 A.2d 659, 665 (Pa. Super. 2008) (*en banc*) (internal quotation marks and citations omitted), *appeal denied*, 966 A.2d 571 (Pa. 2009). The trial court explained its consideration of the totality of the circumstances and its conclusion that the subsequent interaction between the driver and Trooper Nolan was a mere encounter as follows.

> The following facts were considered in determining whether a reasonable person in the driver's position would have believed she was free to leave. This [c]ourt looked to the fact that there were two other officers on scene in addition to Trooper

Nolan (the "Trooper"), however they were located several yards away from the Trooper, behind his patrol vehicle. The other officers on scene were not speaking with the driver or any of the vehicle occupants while the Trooper was obtaining consent for the search. There is no evidence than any of the officers had any physical contact with the driver or the occupants of the vehicle before the [T]rooper requested to search the vehicle. The Trooper's patrol car was parked on an angle behind the driver's vehicle, with his lights on. The driver could have driven away without the Trooper moving his vehicle. The Trooper did not yell at the driver or the vehicle occupants or brandish his gun. Lastly, the Trooper expressly told the driver that she was "free to leave."

The facts here do not suggest that the Trooper acted in a coercive manner or spoke forcefully to the driver or any of the vehicle occupants. Given the totality-of-the-circumstances, the subsequent round of questioning by the Trooper after the initial valid traffic stop, once the Trooper returned all the driver's documentation and instructed the driver that she was free to leave, was [a] mere encounter and therefore the consent to search was not tainted by an illegal detention.

Trial Court Opinion, 3/20/15, at 6-7. For the following reasons, we disagree with the legal conclusion drawn by the trial court that the driver was engaged in a mere encounter with Trooper Nolan prior to giving her consent. *See Gary*, *supra*.

At the suppression hearing, the only evidence presented by the Commonwealth was the testimony of Trooper Nolan, and the defense presented no evidence. The testimony of Trooper Nolan established the events unfolded according to the following timeline. Trooper Nolan initiated the traffic stop for an extinguished brake light, and the vehicles pulled into a

"small parking lot." *Id.* at 11, 23. He was in full uniform in a marked patrol vehicle, with the lights activated. *Id.* at 20. He parked his vehicle behind the driver's vehicle on an angle, which would permit the driver to pull out of the parking lot without Trooper Nolan moving his car. *Id.* at 21. On scene, two other officers were present behind Trooper Nolan's patrol car, in full uniform. *Id.* at 22, 42. Trooper Nolan testified that he recalled at least one of the two other police vehicles present was a marked police car; he could not recall the other, specifically. *Id.* at 43. As he approached the vehicle, he noticed there were five occupants therein. *Id.* at 12. He further observed at this time that Appellant, seated in the backseat, had "track marks" located on her hands, and her hands appeared to be swollen. *Id.* at 13. Trooper Nolan testified that, in his experience, the appearance of her hands indicated she was a drug user. *Id.* Trooper Nolan approached the driver, who appeared nervous, and asked her to step out of her vehicle. *Id.* The driver complied and walked toward Trooper Nolan's vehicle. *Id.* As the driver exited, Trooper Nolan observed a small, black rubber band "consistent with putting heroin packets together" in plain view "on the floor, next to the [driver's] seat." *Id.* at 13-14. Next, Trooper Nolan spoke with the driver, showed her which of her brake lights was out, and secured the driver's license, registration, and insurance documents. *Id.* at 14-15. Trooper Nolan then ran the driver's registration information, approached the driver's vehicle, and began speaking with the front seat passenger; Appellant was

seated behind the driver's seat along with two other passengers in the back seat. *Id.* at 16-17. Trooper Nolan testified that he had received "conflicting stories" from the driver and the occupants regarding where they were coming from, and the occupants appeared nervous. *Id.* at 16-17. During his conversation with the occupants, Trooper Nolan requested their identifications, and they complied. *Id.* He then went back to his patrol vehicle, and the driver returned to her vehicle. *Id.* At his patrol vehicle, Trooper Nolan ran the driving records and criminal histories of all occupants, which yielded Appellant's out-of-state violations related to drug offenses. *Id.* at 18. He then typed up a warning for the brake light and filled out a written request for consent to search the vehicle. *Id.* at 18-19. Trooper Nolan returned to the driver's side of the vehicle and again requested the driver step out. *Id.* at 19. He specifically testified as follows regarding issuing the warning and his encounter with the driver thereafter.

[The Commonwealth]:

Q. What did you do [after the driver stepped out of her vehicle]?

[Trooper Nolan]:

A. I explained to the operator of the vehicle that I'd be issuing her a warning for the brake light. At that time[,] I gave [the driver] her warning back, her registration, her license and her insurance card.

Q. At this -- I'm sorry, go ahead.

A. I gave her that back, and at that time I told her she was free to leave.

- 12 -

Q. Now, at this point in time did you have any documents that belonged to her?

A. I did not, no.

Q. Did you have any of her possessions?

A. No.

Q. And specifically what words did you say to her after you gave the documents back?

A. I said to her she was free to leave.

Q. What did you do after you said that?

A. After I said she was free to leave, she turned around, walked towards her vehicle. I turned, took several steps towards my vehicle.

After several steps, I turn[ed] around and asked the operator if she had a few minutes. At that time she acknowledged that she did. She turned around and walked towards me.

…

Q. … What specifically did you say to her after you had both walked away.

A. After I've already said she was free to leave?

Q. Yes.

A. I called her by her first name, which I don't remember what it was, and I asked if she had a minute or can I have a minute of your time or something to that effect.

Q. Did you command her to return?

A. No.

Q. Did you make any orders?

A. No.

Q. Now, you said you're free to go and then you asked another question. Between that space of time how much time had elapsed?

A. I don't know time. I mean, you're talking, I turned towards my vehicle, walked towards mine, and … she was in front of my vehicle and she had turned around. She took several steps. She was almost by the door of her driver's side door, to give her that leeway.

…

Q. I'm assuming, then, that you met at some point. Did you have a discussion then?

A. Yes.

Q. What was the discussion about?

A. Just -- I don't remember specifically. I had asked if there's anything in the vehicle. I explained to her the stuff that I had seen inside the vehicle which led to me being suspicious that there may be something inside the vehicle. She related that there was not.

At this time[,] I requested written consent. The operator gave me a verbal and written consent to search the vehicle.

N.T., 11/17/14 at 19-20; 24, 26. On cross-examination, Trooper Nolan clarified that at the time he reengaged the driver, he no longer had any of her items or the passengers' items.

[Counsel for Appellant]:

- 14 -

> Q. And you gave [the driver] her documents back [after requesting driver to exit her vehicle in order to give her the warning]?
>
> A. Well, I explained to her that I was issuing her a warning, issued that to her, gave her license back, her registration and also her insurance card. Gave all her documentations back.
>
> Q. When did you give the passengers back their ID's?
>
> A. I might have given them to the driver. I didn't have them still. I believe I might have given them to the driver.

*Id.* 47-48. He further testified regarding his training as follows.

> [Counsel for Appellant]:
>
> Q. Have you been trained to tell people you're free to go and then follow up with ["]can I ask you some questions[?"]?
>
> A. Yes, because she is free to go.

*Id*. at 49.

In *Commonwealth v. Nguyen*, 116 A.3d 657 (Pa. Super. 2015), this Court recently analyzed the constitutionality of a police encounter following an initial, valid traffic stop. In *Nguyen*, a police trooper initiated a valid traffic stop for speeding. *Nguyen*, *supra* at 660, 666-667. The trooper and his partner approached the driver's side, and the trooper explained the nature of the stop to the driver. *Id.* at 660. The trooper asked for and received the driver's license and registration and then asked the driver to exit the vehicle, and the driver complied. *Id.* The trooper's partner then

approached the passenger side of the vehicle, but he did not engage the passenger. *Id.* at 661. Next, the trooper approached the passenger in the vehicle, the appellant, and asked for his license. *Id.* The appellant did not make eye contact and refused to answer the trooper's question, which, in the trooper's experience, was behavior consistent with narcotics activity. *Id.* The appellant eventually gave his information to the trooper. *Id.* The trooper ran the driver and the appellant's information and found that the appellant had prior drug convictions. *Id.* The trooper then returned the paperwork to the driver and the appellant, issued a written warning for the traffic violation, and told the driver he was "free to go." *Id.* The trooper and his partner walked toward their vehicle while the driver walked toward his. *Id.* As the trooper approached the door of his vehicle, he turned around and asked the driver if he could ask him some more questions. *Id.* The driver had reached the side of his door at this point and agreed to answer the trooper's questions. *Id.* The trooper proceeded to ask the driver some questions about the driver's nervousness and his relationship with the appellant and requested consent to search the vehicle and "all of its contents." *Id.* Following receipt of consent by the driver to search the vehicle, the trooper asked the appellant to step out of the vehicle, and ultimately, as a result of the interaction, the appellant was convicted of several drug offenses. *Id*. at 661-662.

This Court concluded, "given the facts surrounding the subsequent interaction … the driver and [a]ppellant were subject to a second seizure." *Id.* at 667. Specifically, this Court observed the following.

> [T]he driver and [the a]ppellant were stopped for a lawful detention resulting from the motor vehicle code violations. Because the trooper had accomplished the purpose of the stop, as indicated by the issuance of a warning and stating that the driver and [the a]ppellant were free to go, the driver would have been in his rights to drive away at that point. Nevertheless, the trooper's subsequent actions were inconsistent with his statement that they were free to leave. After walking toward his cruiser, the trooper turned around and returned to the driver's vehicle, approached the driver, and began to ask the driver additional questions. Moreover, when the trooper re-engaged the driver, the driver was still standing outside of his vehicle.

*Id.* at 667-668. This Court further concluded that the stop required reasonable suspicion. *Id*. at 668. However, because the trooper "possessed the information regarding [the a]ppellant's criminal history prior to ending the initial stop based on the traffic information[,] … such information could not serve as the basis of reasonable suspicion for the subsequent interaction after the initial stop ended." *Id.*

In the instant case, the evidence at the suppression hearing established Trooper Nolan initiated a valid traffic stop based on the driver's broken brake light. N.T. 11/17/14, at 11. During the course of the initial stop, he noticed nervous behavior of the driver; a single, small black rubber band near the driver's side on the floor; and Appellant's hands, which were

swollen and, in his opinion, had an appearance consistent with drug use. *Id.* at 12-14. There were two other officers present, in full uniform, and each parked their respective patrol vehicle behind Trooper Nolan's in what Trooper Nolan described as a "small parking lot." *Id.* at 21-23. Further, Trooper Nolan twice requested that the driver leave her vehicle. *Id.* at 13, 19. Specifically, Trooper Nolan requested the driver to step out of her vehicle when he first approached the driver to show her the broken brake light and request her documentation. *Id.* at 13-15. The driver then returned to her vehicle, and Trooper Nolan returned to his vehicle to type up the written warning. *Id.* at 17. Before issuing the warning to the driver or returning the documentation, Trooper Nolan again requested the driver to step out of her vehicle. *Id.* at 19. After issuing the warning, Trooper Nolan informed the driver she was free to go and, after she walked toward her car, asked her if he could have a few more minutes of time, which resulted in the consent to search her vehicle. *Id.* at 19-20. Under the totality of the circumstances, we conclude the driver and Appellant were subject to a second seizure. *See McAdoo*, *supra*; *see See also Moyer*, *supra* at 667 (observing that a coercive environment was demonstrated by, *inter alia,* the police directing the appellee out of the vehicle "even though the existence of a hole in [the appellee's] taillight could readily have been addressed while [the a]ppellee remained in his vehicle" and noting "the reintroduction of questioning occurred within seconds after the admonition that [a]ppellee

could leave the scene, rendering the interdiction virtually seamless"); ***Nguyen***, ***supra*** at 668 (noting when a person is located outside, rather than inside, his or her vehicle, that person is less likely to believe he or she can leave the area by entering the vehicle and driving away). Further, identical to the subsequent encounter initiated by the trooper in ***Nguyen***, Trooper Nolan's articulated reasons for suspicion, *i.e.*, the appearance of Appellant's hands, the nervous behavior, and the single, black rubber band, were possessed **prior** to his termination of the first, valid detention. Therefore, there was no new information on which he could base a reasonable suspicion of criminal activity, and we conclude the subsequent detention was unconstitutional. ***See Nguyen***, ***supra*** at 668.

Accordingly, because the driver's consent was the product of the illegal detention, the trial court erred in denying Appellant's motion to suppress. ***See Commonwealth v. Freeman***, 757 A.2d 903, 906, 909 (Pa. 2000) (noting, "where [] an illegal seizure precedes the consent search, the Commonwealth must also establish a break in the causal connection between the illegality and the evidence thereby obtained" and concluding that "the trooper's initiation of a second seizure and receipt of [the appellant's] consent were integrally connected" requiring suppression of the fruits of the search).

Based on the foregoing discussion, we reject the Commonwealth's argument that the driver was engaged in a mere encounter following the

conclusion of the initial traffic stop, and we conclude Appellant was subject to a second investigative detention without reasonable suspicion. We further conclude that the consent to search was tainted by the illegal detention. Therefore, the trial court erred in denying Appellant's motion to suppress.[5] Accordingly, we vacate Appellant's judgment of sentence, reverse the order denying suppression, and remand for proceedings consistent with this memorandum.

Judgment of sentence vacated and order denying Appellant's suppression motion reversed. Case remanded. Jurisdiction relinquished.

Justice Fitzgerald joins the memorandum.

Judge Allen concurs in the result.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/24/2015

---

[5] Based on our resolution of Appellant's first issue, we need not address her remaining issues.