J. A21010/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| BRIAN WASHINGTON, | : | |
| | : | |
| Appellee | : | No. 2933 EDA 2013 |

Appeal from the Order September 19, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division No(s).: CP-51-CR-0001569-2013

BEFORE: ALLEN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED AUGUST 21, 2015**

Appellant, the Commonwealth of Pennsylvania ("the Commonwealth"), appeals from the September 19, 2013 order of the Philadelphia County Court of Common Pleas, granting the motion to suppress filed by Appellee, Brian Washington.[1] The Commonwealth contends the trial court erred in suppressing the gun found in Appellee's car after a valid investigatory stop. We affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Pennsylvania Rule of Appellant Procedure 311(d) states, "In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution." Pa.R.A.P. 311(d). The Commonwealth certified in its notice of appeal that the order below terminates or substantially handicaps the prosecution.

J.A21010/15

We glean the facts from the suppression hearing. Police Officer Alexis Luna testified at the hearing.

> We were on patrol. We received a radio call for a [sic] gunshots, 2000 and Denny. We were on our way to 2000 Denny and that we were driving down the 4200 block of Wayne Avenue going towards Denny. There was a unit that was already on location with the founded [sic] shooting and someone was shot at the location. And as we were driving down Wayne Avenue . . . northbound, we observed a tan Chrysler driving southbound, which is away from Denny on Wayne Avenue with no lights, no lights on and he was traveling at a low rate of speed.
>
> [The Commonwealth:] Now, Officer, how far from the location of the gunshots did you see this Chrysler?
>
> A: It was about maybe no more than three blocks away.
>
> Q: . . . And how soon after the gunshots, the radio call for gunshots, did you see the vehicle?
>
> A: It was—I'm say [sic] within minutes, because we were on our way over there, and then it was closer to when the unit was on location at 2000 Denny the founded [sic] shooting, that we saw the vehicle actually leaving that location. Within the time of the unit saying that they had a founded [sic] shooting until when we saw the tan car leaving the location was, I would say, like a minute.
>
> *     *     *
>
> As soon as we saw him, we did [sic] U-turn and activated our lights and pulled him over.
>
> *     *     *
>
> So we pulled the vehicle over. Myself and my partner got out. I was on the driver's side. My partner was on the passenger side. We investigated the car stop on him and we basically—when I approached him, I saw that the vehicle was still in drive, and the car was on. I told him to

turn the vehicle off and put it in park—put it in park and turn the vehicle off. . . .

* * *

Q: . . . And after you asked him twice, did [Appellant] put the car in park?

A: Yes, he did.

Q: And what was the next question that you asked him?

A: Well, he turned the vehicle off, as well, and then I asked him for license and registration and proof of insurance.

Q: And did he comply?

A: Well, basically that's when he, with his right hand, he was 'bout to go into his jacket, like his inside jacket. That's when I told him to stop, step out of the vehicle, that there was just a founded [sic] shooting and there was—he was the only——he was coming from that area with his lights off and all that, so I believed that just for officer safety, that if I can have him come out of the car and frisk him, looking for weapons . . . .

* * *

Q: . . . And when you say for officer safety, what exactly do you mean?

A: I believed that he may have had a weapon.

* * *

Q: And did he ever pull anything out of his jacket?

A: No, I told him to stop, and to exit the vehicle.

* * *

Q: And can you describe his demeanor?

A: **He was nervous, but I understood why he was nervous because there were police around**.

\* \* \*

Q: . . . So after you took him out of the car, what happened?

A: I took him out of the car. I patted him down to make sure there was no weapons. And, basically, my partner asked **if he could look inside the center console of the vehicle**. And [Appellant] stated that he can search whatever, so then my partner searched the center console. **There was nothing in there. I told [Appellant] he can have a seat back inside. I knew that he was on-person secure. And as he had a seat in the car, my partner went in the glove compartment and found the gun** and my partner says get him back out, so I got him back out. So I put him in custody.

N.T., 9/19/13,[2] at 7-8, 9, 10, 13, 14, 15, 16, 17 (emphases added).[3]

Defense counsel cross-examined Officer Luna, *inter alia*, as follows:

Q: [W]hen he's outside the car, though, and have nothing on him and he's cooperating with you and tells you he has no weapons. At that point you had not—other than not having the lights on, you didn't see him committing any crime, fair enough?

A: Fair enough.

Q: You saw like no drugs in the car, no gun, no nothing, fair enough?

A: Yes.

---

[2] We note a typographical error in the trial court opinion. The trial court refers to the September 16, 2013, notes of testimony from the suppression hearing.

[3] Appellee had a valid license and registration for the car. *Id.* at 38.

Q: He's so cooperative with you, that for some reason your partner asks him can I search the center console, right?

A: That is correct.

Q: And when he asked him about the center console, my client's already out of the car. . . .

A: Yes, outside of the vehicle.

\* \* \*

Q: . . . So the goal was, all right, at this point we're going to give him a ticket, but we're going to search the center console to make sure when we let him go he doesn't have any reach of any weapons, correct?

A: That's correct.

\* \* \*

Q: . . . So he says go ahead or whatever, you said search whatever you want, . . . and he searches the center console and finds nothing, right?

A: That's correct.

\* \* \*

We didn't search the car. My partner just searched the center console.

Q: Why would you put him back in the car if your intention was to search the glove compartment, under the seat, in the back, other area? Why would you put him back in the car?

A: Our intent wasn't to search the vehicle at that point.

Q: . . . Your intent was not to search the vehicle. **You put him back in the car. You were done with him**. He'd been cooperative. He did everything you want, fair enough?

A: Well, he was cooperative, but then my partner went in the glove box and—

\* \* \*

The Court: . . . Was he in the car when you searched the glove compartment?

The Witness: Yeah, he was in the vehicle. He wasn't in the vehicle when my partner searched the center console.

\* \* \*

Q: But you put him back in the car, and when you put him back in the car, that's when your fellow officer decided to search the closed glove compartment, fair enough, it was closed?

A: Yes, it was closed.

\* \* \*

Q: . . . **You search the center console. That's done. [Appellee's] put back in the car . . . . Everything's done at that point, but then Monte then decides to search the closed glove compartment, right**?

A: **Yes, he went into the glove compartment**.

Q: . . . While you're there, **do you hear Monte ask permission to search the closed glove compartment**?

A: **No**. . . .

\* \* \*

The Court: . . . You indicated that you only heard your partner ask about searching the center console?

The Witness: That is correct.

\* \* \*

The Court: Did you hear your partner make a specific inquiry about searching the glove box?

The Witness: No, I did not.

*Id.* at 42-43, 44, 47-48, 49-50, 52, 53 (emphases added).

Police Officer Monte testified, *inter alia*, as follows:

Q: . . . Upon taking [Appellee] out of the vehicle, what did you do?

A: I asked [him] if he had any weapons on him or in the car, and he said, no. I asked him repeatedly, and he said, no.

Q: When you say repeatedly, how many times did you ask him?

A: At least three times.

\* \* \*

Q: . . . And after the third time of asking him, what did you do?

A: . . . **I asked him if I could check the center console area,** the immediate area of the car for weapons, and he said, quote, you can search whatever you want.

Q: . . . And did you check the center console?

A: Yes.

Q: And did you discover anything in the console?

A: Not in that area, no.

\* \* \*

Q: . . . **He was put back in [sic] driver's seat of the car before you searched the closed glove compartment**; is that correct?

A: Briefly. . . .

Q: No—but he was put back in the car. **He was sitting back in [sic] driver's seat before you searched the**—

A: **Yes**.

\* \* \*

Q: . . . You never specifically asked for permission to search the closed glove compartment of that car, did you.

A: By saying glove compartment, no. I did not say the word glove—

Q: . . . Originally you asked for center console, correct?

A: And the immediate area, but fair enough, yes. Correct.

*Id.* at 62, 63, 69-70 (emphases added). At the conclusion of the hearing, the court granted the motion to suppress. *Id.* at 92. This timely appeal followed. The Commonwealth filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal contemporaneously with the notice of appeal. The trial court filed a responsive opinion.

The Commonwealth raises the following issue for our review:

> Where officers responding to a report of shots fired nearby stopped [Appellant], who was driving slowly with his lights off at night, and [Appellant] hesitated to pull over, shift into park and turn off the ignition, began reaching for his pocket, appeared nervous, and said to the officers "you can search whatever you want," did the lower court err in suppressing the gun found in [Appellant's] glove compartment?

Commonwealth's Brief at 4.

The Commonwealth argues Appellee consented to the search of his car. *Id.* at 9. The Commonwealth contends that when Appellee stated "you can search whatever you want," that was tantamount to his consent to a search of the entire car, including the glove compartment, not just the console. *Id.* at 11-12. Furthermore, even if Appellee did not consent to the search of the glove compartment, there was reasonable suspicion to search it. *Id.* at 12.

Our review of the suppression court's grant of a motion to suppress is governed by the following principles:

> When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. [Where the defendant] prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Cartagena*, 63 A.3d 294, 298 (Pa. Super. 2013) (*en banc*) (citation omitted).

Further, Pennsylvania Rule of Criminal Procedure 581, which addresses the suppression of evidence provides, in relevant part, as follows: "The

Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights."  Pa.R.Crim.P. 581(H).

The standard upon which we determine whether the search of the glove compartment was consensual[4] is as follows:

> To establish a valid consensual search, the prosecution must first prove that the consent was given during a legal police interaction, or if the consent was given during an illegal seizure, that it was not a result of the illegal seizure; and second, that **the consent was given voluntarily**.

***Commonwealth v. Reid***, 811 A.2d 530, 544 (Pa. 2002) (citations omitted and emphasis added).

In ***Commonwealth v. Tam Thanh Nguyen***, 116 A.3d 657 (Pa. Super. 2015), this court explained the nature of the interaction between citizens and police officers.

> Interaction between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained.  The three levels of interaction are:  mere encounter, investigative detention, and custodial detention.
>
> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.

---

[4] Given our standard of review, we first address the issue of whether there was reasonable suspicion to search the glove compartment.

- 10 -

In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. . . .

To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved.

To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Id.* at 664-65 (quotation marks and citations omitted).

In ***Cartagena***, this Court held that the police officers lacked reasonable suspicion to search the center console of the defendant's vehicle, following a traffic stop for driving with tinted windows. ***Id.*** at 296. This Court opined:

> This case is controlled by the United States Supreme Court's decision in ***Michigan v. Long***, 463 U.S. 1032 [ ] (1983). In ***Long***, the Supreme Court applied the principles announced in ***Terry v. Ohio***, 392 U.S. 1 [ ] (1968), to a search of the passenger compartment of a vehicle for weapons:
>
> Our past cases indicate [ . . . ] that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. '[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' If a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested.
>
> The Court emphasized that this holding does not permit police to conduct a search of a vehicle during every investigative stop. "A ***Terry*** search, unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime. The sole justification of the search is the protection of police officers and others nearby." The Court stated that an officer must therefore have reasonable suspicion that the person subject to the

- 12 -

stop has a weapon in order to conduct a lawful search of the passenger compartment of a vehicle at the time of the stop.

*Id.* at 298-99 (footnotes and some citations omitted).

In the case *sub judice*, the trial court opined:

Though there was reasonable suspicion and probable cause to stop [Appellee's] vehicle for a traffic violation[,] the search of [Appellee's] glove compartment exceeded the purpose and scope of the stop. It is clear from the totality of circumstances in the current case that [Appellee] was not free to leave the vehicle after the officers investigated the traffic violation, and thus was seized requiring reasonable suspicion for further investigation. . . . The police directed [Appellee's] movement when they made him stop what he was doing, removed him from the vehicle, and later let him back into the vehicle. . . .

There was no justified belief that [Appellee] was armed and dangerous, to warrant a **Terry** search of [Appellee's] glove compartment. Though [Appellee] acted nervously he did not make any furtive movements or refuse to cooperate. Officer Luna specifically noted that she understood why a person would be nervous in the situation. There is no justifiable belief that [Appellee] was armed as the officers had already searched [Appellee], searched the area surrounding him, searched and [sic] the center console, and returned him to the driver's seat.

Trial Ct. Op., 1/21/15, at 5, 6 (citation to record omitted). Furthermore, the trial court found that Appellee did not give permission for the search of the glove compartment, reasoning as follows:

As police's continued investigation rose from a mere encounter to an investigative detention, [Appellee's] permission to consent must be deemed involuntary. Beyond this, Officer Monte's search of [Appellee's] glove compartment exceeded the scope of [Appellee's] authorization to search.

> When an official search is properly authorized, the scope of the search is limited by the terms of its authorization. . . .
>
> Officer Monte asked [Appellee] to search a specific, and self contained, area of the car, to which [Appellee] replied, "you can search whatever." This court finds, based on the totality of the circumstances that [Appellee's] reply that the officer could search whatever was in reply to searching the center console, not a carte blanche authorization to search anything owned or possessed by [Appellee].

*Id.* at 6-7. We agree no relief is due.

We discern no abuse of discretion or error of law by the trial court. *See Cartagena*, 63 A.3d at 298. The officer lacked reasonable suspicion to justify the *Terry* search of Appellee's glove compartment. *See id.* at 298-99; *Tam Thanh Nguye*, 116 A.3d at 666-67. Appellee did not voluntarily consent to the search of the glove compartment. *See Reid*, 811 A.2d at 544. Accordingly, we affirm the order granting Appellee's motion to suppress.

Order affirmed.

Judge Allen joins the memorandum.

Judge Mundy concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/21/2015

- 14 -