J-A09024-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RANDY JESUS VALDIVIA | |
| Appellant | No. 319 MDA 2015 |

Appeal from the Judgment of Sentence January 23, 2015
In the Court of Common Pleas of Centre County
Criminal Division at No(s): CP-14-CR-0002234-2013

BEFORE: FORD ELLIOTT, P.J.E., JENKINS, J., and PLATT, J.[*]

MEMORANDUM BY JENKINS, J.:                    **FILED JULY 19, 2016**

Randy Valdivia appeals from his judgment of sentence of 11½ - 23 months' imprisonment followed by 30 days' probation for possession with intent to deliver a controlled substance, possession of a controlled substance and possession of drug paraphernalia.[1] Valdivia contends that the trial court erred in denying his motion to suppress all evidence seized from his motor vehicle during a traffic stop following a written traffic warning. We conclude that state troopers had reasonable suspicion to detain Valdivia for investigation, and that he voluntarily consented to the search of his vehicle,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30), (a)(16) and (a)(32), respectively.

including a canine sniff of items found in the passenger compartment. Accordingly, we affirm.

Valdivia was arrested following discovery of marijuana in his car during a traffic stop on Interstate 80. The trial court held a suppression hearing and subsequently entered findings of fact and conclusions of law denying Valdivia's motion to suppress. The case proceeded to a non-jury trial in which the court found Valdivia guilty of all charges. After sentencing, Valdivia filed a timely notice of appeal, and both Valdivia and the trial court complied with Pa.R.A.P. 1925.

Valdivia raises three issues in this appeal:

1. Whether the trial court erred in denying [] Valdivia's motions to suppress all evidence and fruit of the poisonous tree where the arresting officer illegally detained [] Valdivia and engaged in a second investigative detention that was not supported by reasonable suspicion once the initial traffic stop was completed, and where the initial traffic stop was unreasonably prolonged to allow time for a drug sniffing canine to arrive on the scene?

2. Whether the trial court erred in denying [] Valdivia's motions to suppress all evidence and fruit of the poisonous tree since any purported consent to search given by [] Valdivia was not knowingly, intelligently, or voluntarily given and any purported consent to search was the product of an unconstitutional search?

3. Whether the trial court erred in denying [] Valdivia's motion to suppress evidence and all fruit of the poisonous tree since the canine sniff was illegal and not supported by reasonable suspicion, and where the use of trained drug-sniffing dogs was outside the scope of any purported consent?

Brief For Appellant, at 7.

All three arguments on appeal challenge the denial of Valdivia's motion to suppress. In an appeal from the denial of a motion to suppress,

> [our] standard of review … is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where … the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [] plenary review.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa.2010).

The record supports the following findings of fact made by the trial court. On December 12, 2013, Troopers Hoy and Long were traveling east bound in a marked patrol cruiser on Interstate 80. Trial Court's Findings of Facts ("FF"), ¶ 1. The troopers were following a white Dodge Caravan with a Michigan license plate in the left hand lane. FF, ¶ 2. Trooper Hoy observed the vehicle quickly move from the left lane to the right lane without using a turn signal, at which time Trooper Long immediately activated his overhead lights and initiated a traffic stop. FF, ¶ 3.

Both Troopers Hoy and Long exited their police cruiser and Trooper Hoy approached the vehicle from the passenger side while Trooper Long

stood behind the vehicle as backup. FF, ¶ 4. As Trooper Hoy approached the vehicle, he noticed two large boxes wrapped in Christmas paper and a suitcase in the cargo area of the vehicle. FF, ¶ 5. Trooper Hoy testified that drug smugglers often wrap drugs in Christmas paper around the holidays in an effort to blend in with innocent motorists. N.T., 8/8/14, at 25.[2]

Trooper Hoy asked the driver (Valdivia) for his license, registration, and proof of insurance. Valdivia gave Trooper Hoy a license and rental agreement and stated that the vehicle was a rental. FF, ¶ 6. As Valdivia produced the documents, the trooper noticed that Valdivia's hands were shaking, and that he seemed nervous. Valdivia stated that he needed to pull off and get gas. FF, ¶ 7. Trooper Hoy found this strange because gas had been available at two exits that Valdivia had just passed. N.T., 8/8/14, at 9.[3]

Trooper Hoy asked Valdivia about his travel plans. Valdivia responded that he was flying from Fort Lauderdale, Florida to New Jersey, but his flight had been re-routed to Detroit, Michigan, and he had to rent a vehicle because he had missed his connecting flight to New Jersey. FF, ¶ 8.

---

[2] Although the trial court did not include this detail in its findings of fact, we have the authority to consider it because the Commonwealth presented this evidence and prevailed in the trial court on Valdivia's motion to suppress. *See Jones*, 988 A.2d at 654.

[3] We have the authority to consider this detail for the reasons given in footnote 2.

Trooper Hoy found it strange that the packages in the cargo area were unblemished, even though they presumably had been part of Valdivia's belongings on his flight from Florida. *Id*. at 15.[4] Trooper Hoy noticed from the vehicle information that Valdivia rented the car in Ann Arbor, Michigan, not Detroit, Michigan as he had stated, and that the rental was for a one-way trip. FF, ¶ 9. Trooper Hoy knew from his training and experience that the route Valdivia was traveling, Michigan to New Jersey, is a common drug trafficking route. FF, ¶ 10.

Trooper Hoy then went back to his patrol cruiser and ran a records check, as is his custom, while completing the warning paperwork for the illegal lane change. FF, ¶ 11. Trooper Hoy also contacted a State Police K-9 Unit to respond to the scene. FF, ¶ 12. The record check revealed that Valdivia had been previously charged in Florida with possession with intent to deliver. FF, ¶ 13.

Trooper Hoy returned to Valdivia's vehicle, asked him to exit the vehicle, explained the warning, and returned Valdivia's identification documents. FF, ¶ 14. Trooper Hoy then inquired if he could ask some follow-up questions about Valdivia's travel plans. FF, ¶ 15. Valdivia changed his story when answering these additional questions. He now

_____

[4] We have the authority to consider this detail for the reasons given in footnote 2.

stated that he had flown to Detroit to visit a friend and had left early the next morning. He also said that when he arrived at the Detroit airport, all of the rental companies were closed, which was why he rented the vehicle in Ann Arbor. FF, ¶ 16. Trooper Hoy felt that Valdivia's responses were unusual, because one does not normally visit a friend for such a short time, most of which would be spent sleeping. Trooper Hoy also found it difficult to believe that all rental companies would have been closed at a large airport such as Detroit. FF, ¶ 17.

Trooper Hoy asked Valdivia for consent to search his vehicle, and Valdivia agreed. Trooper Long filled out a consent to search form, and Valdivia signed the form after reading it. N.T., 8/8/14, at 17-18, 81-82.[5] The consent form itself was not admitted into evidence, *Id*. at 2, but Trooper Long testified that the form stated that Valdivia did not have to consent to the search. *Id*. at 81-82. Valdivia never revoked his consent or said: "No, stop searching." *Id*. at 82.

Trooper Hoy testified that after Valdivia gave verbal consent to search his vehicle, he told Valdivia that he would call a K-9 unit to assist in the search. N.T., 8/8/14, at 54. Later in his testimony, however, Trooper Hoy testified that he could not remember whether he told Valdivia that he would call for a K-9 unit. *Id*. at 55-56.

---

[5] We may consider this detail for the reasons given in footnote 2.

Trooper Tiracorda, his K-9 partner, Tom, and several other state police officers arrived at the scene in marked police cruisers. FF, ¶ 20. Trooper Hoy and the other officers searched the vehicle while Valdivia sat in the back seat of the patrol cruiser upon an offer by the Troopers due to the cold weather. FF, ¶ 21.

The troopers removed the Christmas packages from the back of the vehicle and placed them on the ground in an area safe enough for Tom to perform a canine sniff. FF, ¶ 22. There is no evidence that Valdivia objected to the canine sniff. Tom alerted to the larger of the two packages on the first "fast pass" by stopping in front of the package, changing his posture, and increasing his respiration. Tom alerted to the package again on the second systematic search. FF, ¶ 23. The troopers opened the packages and found 21 clear, vacuum-sealed bags, each containing forty smaller bags of what appeared to be marijuana. FF, ¶ 24. Valdivia was placed under arrest. FF, ¶ 25.

One important detail is absent from the trial court's findings of fact. Before obtaining Valdivia's consent to search the vehicle, Trooper Hoy did not tell Valdivia that he was free to leave. Trooper Hoy testified as follows:

> Q. You never at any point in time told [] Valdivia that he was free to leave, free to be on his way and go about his business. That's true?

A. Yeah, that's true. At that time I had reasonable suspicion to believe that there was criminal activity in the vehicle.

N.T., 8/8/14, at 49.[6]

In his first argument on appeal, Valdivia argues that Trooper Hoy lacked reasonable suspicion to detain Valdivia for further investigation after issuing the traffic warning. We disagree.

Preliminarily, Valdivia does not dispute that the initial traffic stop was legal. Nor could he, because the evidence demonstrates that Trooper Hoy had probable cause to believe that Valdivia violated the Vehicle Code by changing lanes without using his turn signal. *See* 75 Pa.C.S. § 3334(a) ("upon a roadway no person shall … move from one traffic lane to another … unless and until the movement can be made with reasonable safety nor without giving an appropriate signal in the manner provided in this section"); *Commonwealth v. Spieler*, 887 A.2d 1271, 1275-76 (Pa.Super.2005) (police officer had probable cause to stop defendant for violation of section 3334 where defendant moved to and from right-hand to left-hand lane without using appropriate signals).

_____

[6] We have the authority to consider this additional evidence because it "remains uncontradicted when read in the context of the record as a whole." *Jones*, 988 A.2d at 654.

Trooper Hoy developed reasonable suspicion during the traffic stop to believe that Valdivia was transporting illegal controlled substances. We have defined "reasonable suspicion" as follows:

> [T]he officer must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot … In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight … to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Smith*, 917 A.2d 848, 852 (Pa.Super.2007) (citations omitted).

During a traffic stop, the officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarthy*, 468 U.S. 420, 439 (1984). "[I]f there is a legitimate stop for a traffic violation … additional suspicion may arise before the initial stop's purpose has been fulfilled; then, detention may be permissible to investigate the new suspicions." *Commonwealth v. Chase*, 960 A.2d 108, 115 n.5 (Pa.2008). The fact that a driver is nervous or overly apologetic during a traffic stop does not, without more, furnish reasonable suspicion for continued investigatory detention. *See Commonwealth v. Tam Thanh*

***Nguyen***, 116 A.3d 657, 669 (Pa.Super.2015). Conversely, nervous behavior during a traffic stop, combined with other factors, may give rise to reasonable suspicion that criminal activity is afoot. ***See Commonwealth v. Caban***, 60 A.3d 120, 129-30 (Pa.Super.2012) (following valid traffic stop for speeding, officer had reasonable suspicion of criminal activity to justify continued detention of driver and passenger; driver acted nervously, car was owned by third party not present in vehicle, answers provided by driver and passenger to basic questions regarding their destination were inconsistent, and various masking agents, including air fresheners, canisters of perfume, and bottle of odor eliminator, were present in vehicle).

Here, Trooper Hoy observed a variety of suspicious details during the traffic stop. Valdivia behaved nervously during the traffic stop, and his hands were visibly shaking. He claimed that he was about to run out of gas, an odd remark given that he had just passed two exits with gas stations. His explanation for why he was driving on I-80 was unusually elaborate. He said that he was flying from Florida to New Jersey, but his flight was re-routed to Detroit, Michigan, and he missed his connecting flight to New Jersey. All car rental companies in Detroit were closed (a detail that Trooper Hoy found unusual due to the size of Detroit's airport), so he had to travel to Ann Arbor, Michigan to rent a vehicle to drive to New Jersey. He was driving a rental vehicle one way, a common tactic of drug smugglers. Inside the car, there were two large boxes wrapped in Christmas paper in the backseat.

Strangely, the packages were unmarked and undamaged, even though they presumably had been on board Valdivia's flight to Detroit. Drug smugglers, Trooper Hoy added, often wrap drugs in Christmas paper around the holidays in an effort to blend in with innocent motorists. Trooper Hoy discovered during a criminal history check that Florida authorities had charged Valdivia with selling drugs. Finally, when Trooper Hoy asked Valdivia to exit the vehicle to receive a warning for his turn signal violation, Valdivia changed his story. He now stated that he flew to Detroit (not New Jersey) to meet a friend and then left the following morning to rent a vehicle to drive to New Jersey. This combination of factors provided reasonable suspicion to detain Valdivia and continue an investigation into possible criminal wrongdoing. *See Caban*, 60 A.3d at 129-30.

In his second argument on appeal, Valdivia contends that he did not voluntarily consent to the search of his vehicle. The Commonwealth bears the burden of proving that the defendant consented to a warrantless search. *See Commonwealth v. Acosta*, 815 A.2d 1078, 1083 (Pa.Super.2003) (*en banc*). To establish a voluntary consensual search, the Commonwealth must prove "that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." *Commonwealth v. Strickler*, 757 A.2d 884, 901 (Pa.2000).

There is no shortage of decisions relating to consent. A convenient starting point is two decisions issued on the same date by our Supreme Court: **Strickler** and **Commonwealth v. Freeman**, 757 A.2d 903 (Pa.2000).

In **Strickler**, a police officer observed a car parked along a country road. Two men were standing near the car and appeared to be urinating. After questioning the men and verifying the documentation for the vehicle and the driver, the officer returned the documents to the driver. At that time, the officer informed Strickler that it was not appropriate to stop along the road and urinate on someone's property. The officer began walking back to his cruiser when he turned and asked Strickler if there was anything illegal in the vehicle. When Strickler stated that there was not, the officer requested Strickler's consent to search the vehicle. The officer told Strickler that he was free to withhold his consent. Strickler consented to the search, which disclosed a marijuana smoking pipe.

The trial court suppressed the marijuana pipe on the ground that Strickler's consent was not voluntary. Our Supreme Court held, however, that Strickler's consent was voluntary, even though the officer never expressly told Strickler that he was free to leave following the initial lawful detention. **Strickler**, 757 A.2d at 900. The Court adopted a totality-of-the-circumstances approach delineating a nonexclusive list of factors to consider in making this assessment, including: (1) the presence or absence of police

excesses; (2) whether physical contact occurred; (3) whether police directed the individual's movements; (4) police demeanor and manner of expression; (5) the location and time of the interdiction; (6) the content of the questions and statements; (7) the existence and character of the initial investigative detention, including its degree of coerciveness; (8) whether and to what degree the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, thus suggesting to the individual that his movements may remain subject to police restraint; and (9) whether the police expressly told the individual that he was free to leave -- this latter factor being an objective and potent one. *Id*. at 898-901. With regard to the last two factors, ***Strickler*** observed:

> The degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless … thus suggesting to a citizen that his movements may remain subject to police restraint, is a pertinent factor … '[F]ew motorists would feel free ... to leave the scene of a traffic stop without being told they might do so.' While recognizing … that the admonition to a motorist that he is free to leave is not a constitutional imperative, the presence or absence of such a clear, identified endpoint to the lawful seizure remains a significant, salient factor in the totality assessment.

*Id*. at 898-99.

The ***Strickler*** court opined: "[T]he officer did not touch Strickler or direct his movements; there is no evidence of any use of coercive language or tone by the officer. *We also deem significant the arresting officer's admonition to Strickler that he was not required to consent to the search*." *Id*. at 900 (emphasis added). Thus, the officer's admonition that Strickler

could refuse consent outweighed the officer's failure to expressly advise the defendant that he was free to leave following the initial detention. *Id*. at 901-02.

In *Freeman*, a state trooper stopped Freeman for making improper lane changes in what appeared to be a "cat and mouse" game with another car on the highway. Freeman denied having any problem with the other car. The trooper gave Freeman a written warning and advised that she was free to leave, but the events that followed

> were inconsistent with [the trooper's] statement to Freeman that she was free to leave …: [the trooper] returned to Freeman's vehicle; questioned her about the second vehicle; pointed out the inconsistent statements from the vehicle's occupants when she denied traveling with that vehicle; and, ultimately and most significantly, asked her to step out of the vehicle prior to the request for consent. Such directive constituted a greater show of authority than had previously been made (other than the physical stop of Freeman's vehicle itself).

*Id*. at 907. The Supreme Court held that these events constituted an invalid seizure, because the trooper had no reasonable suspicion of criminal activity: "Even if Freeman's answer to the trooper's question, contradicting as it did the information given by the occupants of the other car, could arguably be viewed as evasive behavior," the trooper had no more than an "unparticularized suspicion or 'hunch' of criminal activity." *Id*. at 908.

As a result, Freeman's consent was invalid, mandating suppression of the fruits of the resulting search:

> The detention that preceded Freeman's consent to search was unlawful, and Freeman's consent, even if voluntarily given, will

not justify the otherwise illegal search unless the Commonwealth can demonstrate that Freeman's consent was an independent act of free will and not the product of the illegal detention … Here, although we do not view the trooper's actions as flagrant, the record does not establish the necessary break in the sequence of events that would isolate Freeman's consent from the prior coercive interaction. To the contrary, the evidence supports the conclusion that the trooper's initiation of a second seizure and receipt of Freeman's consent were integrally connected.

*Id*. at 909.

In the wake of **Strickler** and **Freeman**, this court has issued many decisions relating to the issue of consent during traffic stops. In some, we held that the totality of circumstances proved voluntary consent;[7] in others, we determined that consent was involuntary.[8]

_____

[7] **See Caban**, 60 A.3d at 131-32 (vehicle passenger's consent to search of vehicle that was owned by his father and driven by his friend was voluntary, where there was no evidence of police abuses, aggressive tactics, physical contact, or use of physical restraints any time during the detention, passenger was advised that he was free to leave, passenger initially refused consent to search, and officer accepted refusal without argument but merely explained that passenger could either consent or wait for drug-sniffing dog to arrive); **Commonwealth v. Kemp**, 961 A.2d 1247, 1261 (Pa.Super.2008) (following valid investigatory stop, defendant voluntarily consented to search of vehicle, even though investigating officer did not inform defendant that he could refuse to consent to search; there was no excessive police conduct, no physical contact occurred between police and defendant, officer did not display his weapon, officer's order to defendant's companion to exit car was necessitated by fact that companion was not licensed driver and had to move out of driver's seat, defendant did not lack maturity or sophistication and was not intellectually incapable of exercising free will, and character of initial investigative detention, the traffic stop, was routine); **Commonwealth v. Bell**, 871 A.2d 267, 274 (Pa.Super.2005) (*en banc*) (defendant voluntarily consented to warrantless search of vehicle, where defendant understood all of his rights, detective informed defendant that police knew he was there to deliver drugs and that officer observed
*(Footnote Continued Next Page)*

*(Footnote Continued)* _____

defendant put package on floor of car, detective invited defendant to cooperate, detective did not coerce defendant into making statement with threats or actions, defendant, having waived his right to remain silent and to an attorney, admitted having an ounce of cocaine for delivery to female at particular location, defendant signed consent form that detective read to him while defendant appeared to read along, and before signing consent form, defendant confirmed that he spoke English and was not under influence of drugs or alcohol); ***Commonwealth v. By***, 812 A.2d 1250, 1258 (Pa.Super.2002) (following valid traffic stop at night, officer obtained defendant's consent to search vehicle through non-coercive means; although two other officers were present, officer spoke casually and non-threateningly, told defendant he was free to leave, did not restrain defendant's movement by use or threat of force, asked defendant if he could search vehicle, and reminded defendant that he was free to leave prior to obtaining consent); ***cf. Commonwealth v. Reid***, 811 A.2d 530, 548 (Pa.2002) (defendant's consent to search his jacket, boots, motel room, and truck, during consensual encounter at police barracks that involved questioning about deaths of defendant's estranged wife and stepdaughter, was voluntary, where, *inter alia*, trooper read consent form to defendant explaining his right to refuse search and defendant signed form).

[8] ***See Tam Thanh Nguyen***, 116 A.3d at 669 (driver's consent to search vehicle vitiated by taint of illegal continued investigatory detention of driver and defendant following conclusion of traffic stop that was not justified by reasonable suspicion of criminal activity; driver consented to search only moments after state trooper re-initiated contact with defendant after advising that driver was free to leave, no intervening circumstances diminished coercive atmosphere of illegal detention or otherwise justified search, and at time of consent, vehicle was surrounded by two troopers and trooper had just repeated questions regarding driver's excessive nervous and apologetic demeanor); ***Commonwealth v. Moyer***, 954 A.2d 659, 668-69 (Pa.Super.2008) (*en banc*) (defendant's consent held involuntary following investigatory stop that itself was not justified by reasonable suspicion; officer reintroduced questioning after returning defendant's documents and telling him he was free, defendant walked from rear of car to car door when officer stopped him again, there was no precise end to traffic stop, two armed and uniformed police officers stood near defendant, who was alone and isolated outside car at night on rural, unlit road when he was asked if he would answer questions, police had activated flashing lights and directed bright white police spotlight at car, defendant was not informed that he did not have to answer further questions, officer told defendant results of

*(Footnote Continued Next Page)*

In the present case, Trooper Hoy requested Valdivia's consent to search his vehicle during a valid investigative detention. Based on the foregoing opinions on consent, we detect a mixture of coercive and non-coercive factors at the time of Trooper Hoy's request. The coercive elements were: (1) Trooper Hoy never told Valdivia he was free to leave, a factor found coercive in *Acosta* and *Moyer*; (2) Trooper Hoy ordered Valdivia to exit his car to receive the traffic warning (*see Freeman*), (3) there was more than one trooper at the scene of the stop (*see Acosta*), and (4) Trooper Hoy never verbally advised Valdivia that he was free to refuse consent (*see Moyer*; *but see Kemp*, in which consent was found voluntary even though officer never advised that defendant was free to refuse search). The non-coercive elements were: (1) Trooper Hoy gave back Valdivia's documentation, (2) there is no evidence of police abuses, aggressive tactics, coercive language, coercive tone of voice, physical contact, or the use of physical restraints any time during the detention (*see Caban*), and (3) Valdivia read and signed a consent form which advised that he did not have

_(Footnote Continued)_ _____

his criminal history check and accused him of past drug activity, and defendant was asked if there were controlled substances or paraphernalia in his car or on his person); *Commonwealth v. Acosta*, 815 A.2d 1078, 1085-87 (Pa.Super.2003) (*en banc*) (consent held involuntary despite prior valid stop for suspended license plate, where officer withheld defendant's vehicular documentation, other officers and marked police cars were present with flashing lights in close proximity to defendant, and officer never expressly informed defendant that he was free to leave or that he was free not to consent to search of vehicle).

to consent. This final element resembles **Bell** and **Reid**, where the reviewing court found voluntariness because the defendant signed a consent form after reading it or having it read to him. From these precedents, it appears that Pennsylvania courts construe the defendant's review of right-to-refuse language on consent forms as a strong sign of voluntariness. While the issue is close, we conclude on balance that the non-coercive elements outweigh the coercive elements. The most persuasive indicium of voluntary consent is that Valdivia read and signed the consent form. He knew from the form that he could refuse consent, but he voluntarily elected not to do so. The suppression court properly concluded that Valdivia gave valid consent to the search of his vehicle.

In his third and final issue, Valdivia argues that even if he consented to the search of his vehicle, the canine sniff of his vehicle exceeded the scope of his consent. "When an official search is properly authorized, the scope of the search is limited by the terms of its authorization." **Reid**, 811 A.2d at 549. The standard for measuring the scope of a person's consent is an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. **Id**.

In this case, a reasonable person would have understood that Valdivia's consent encompassed canine sniffs of packages found in his vehicle. Nothing about a canine sniff strikes us as more intrusive than a

vehicle search by humans, so when an individual consents to an official search of his vehicle, it is natural to assume that his consent includes both human and canine searches. The most logical way – and perhaps the only way – for a defendant to place canine sniffs beyond the scope of consent is to tell the officer that canine searches are off limits. In this case, Valdivia never told any officer that he did not consent to a canine sniff. As the trial court stated:

> Testimony at the hearing was conflicting as to whether or not Trooper Hoy indicated to [Valdivia] that he would be calling a K-9 Unit to conduct a search. Trooper Hoy testified that it was his standard practice to do so but could not recall if he did on this specific instance. Despite this minor uncertainty, the record reflects that [Valdivia] never indicated he was limiting his search so as not to include a consent for a K-9 Unit, nor did he make any attempt to revoke consent when he saw the K-9 Unit arrive.

Pa.R.A.P. 1925 opinion, at 9. Thus, the trial court properly held that the canine sniff did not exceed the scope of Valdivia's consent.

Judgment of sentence affirmed.

President Judge Emeritus Ford Elliott joins the memorandum.

Judge Platt concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/19/2016

- 19 -