J-A16009-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| LAWRENCE MICHAEL OWENS, | |
| Appellant | No. 575 WDA 2015 |

Appeal from the Judgment of Sentence March 13, 2015
In the Court of Common Pleas of Erie County
Criminal Division at No(s): CP-25-CR-0000531-2014

BEFORE:  SHOGAN, OLSON, and STRASSBURGER,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                   **FILED JANUARY 12, 2017**

Lawrence Michael Owens ("Appellant") appeals *pro se* from the judgment of sentence imposed after a jury convicted him of drug charges. Appellant argues that the state trooper lacked reasonable suspicion to detain his vehicle for a dog sniff.  After careful review, we affirm.

The suppression court[1] made the following factual findings:

> On the evening of August 19, 2013, at approximately 7:15 p.m., [Appellant] was driving north on Interstate 79 near the Kearsarge exit. *Suppression Hearing Transcript, June 2, 2014 ("N.T."), pp. 6, 7.*  [Appellant] was driving a Chevrolet Impala belonging to his nephew, Thomas W. Jones.  [Appellant's] six-year old son was sitting in the front seat.  *N.T. p. 15.*

_____

[*]  Retired Senior Judge assigned to the Superior Court.

[1]  The Honorable William R. Cunningham sat as both the suppression judge and the trial judge.

Pennsylvania State Trooper Gary Knott initiated a traffic stop because all of the Impala's windows, except the windshield, were tinted beyond acceptable levels and an object was dangling from beneath the vehicle. *N.T. pp. 6, 7.* Trooper Knott could not see into the vehicle due to the tinting. *N.T. p. 8.*

Trooper Knott did a registration check and determined the car was registered to Thomas W. Jones from Farrell, Pennsylvania. *N.T. p. 8.* Farrell, Pennsylvania is known to Trooper [Knott] as a high-crime area for drug offenses. In particular, Farrell is known as a distribution center for heroin and marijuana. *N.T. pp. 9, 10.*

[Appellant] pulled over onto the berm near the off-ramp to the Millcreek Mall and lowered the driver's side window. *N.T. p. 62.* For officer safety, Trooper Knott approached the vehicle along the passenger side and asked [Appellant] three times to lower the passenger side window. *N.T. pp. 10, 11.* [Appellant] did not comply the first two times but lowered the passenger side window after the third request. *N.T. p. 12.*

When [Appellant] lowered the window, Trooper Knott detected an overwhelming odor of air freshener and observed one air freshener hanging from the gear shift. *N.T. p. 13.* The odor was indicative of more than one air freshener, but no others were in plain view in the car. *N.T. pp. 13, 14.*

Trooper Knott spoke with [Appellant] through the passenger side window. Trooper Knott told [Appellant] the encounter was being recorded on the dash camera on the police vehicle and the microphone on his uniform. *N.T. pp. 52, 53.* Trooper Knott explained to [Appellant] he was being stopped because of the tinted windows and because an object was dangling beneath the car. *N.T. p. 17.* Trooper Knott requested to see the vehicle registration and insurance documents. *Id.*

[Appellant] fumbled about in the car for the documents. His movements were rapid and jittery. *N.T. p. 18.* [Appellant] said he was coming from Farrell and going to Burlington Coat Factory to shop for school clothes for his son. *N.T. pp. 18, 19.* Trooper Knott noticed [Appellant's] hands were trembling and he was mumbling under his breath. *N.T. pp. 18, 20.* [Appellant] related he was driving his nephew's vehicle as his car was in the shop being repaired. *N.T. p. 23.* [Appellant] stated it took

- 2 -

about forty minutes to drive from Farrell to Erie. The actual driving time from Farrell to Erie is about an hour and a half. *N.T. p. 19.*

Trooper Knott determined [Appellant] had a prior drug arrest in 2007. *N.T. p. 21.* Trooper Knott ran a vehicle check on the car to determine whether it had ever been stopped by another trooper. A trooper in Meadville had run the plates on the car in July of 2013. *Id.* Trooper Knott learned Thomas W. Jones had prior criminal convictions, including a conviction for possession of marijuana. *N.T. pp. 22, 58.*

Trooper Knott called for the assistance of another trooper as back-up. *N.T. p. 24; Com. Ex. 1.*[2] When Trooper Rico Coletta arrived, Trooper Knott told [Appellant] to exit his car and stand by the police vehicles while he checked under [Appellant's] car to see what was hanging down and if there were any after-market modifications made to the car. *Com. Ex. 1.* Trooper Knott found a loose grommet from the engine or catalytic converter was hanging down. *N.T. p. 25.*

At this point, Trooper Knott concluded there were a number of indicators criminal activity was afoot. *N.T. p. 24.* Trooper Knott printed out a written warning regarding the tinted windows and dangling grommet and gave it to [Appellant]. *N.T. p. 25.* [Appellant] was displaying nervous behavior. In order to dissipate [Appellant's] nervous behavior, Trooper Knott shook hands with [Appellant] and engaged [Appellant] in conversation to put him at ease. *N.T. pp. 27, 28.* Trooper Knott did not tell [Appellant] he was free to leave. *N.T. p. 28.* The encounter occurred at the back of Trooper Knott's vehicle and in front of Trooper Coletta's vehicle. *N.T. p. 28.*

[Appellant] walked back to his car. *N.T. p. 28.* When [Appellant] reached his car, Trooper Knott re-engaged [Appellant] by asking, "Can we speak?" *N.T. p. 29.* Trooper Knott informed [Appellant] he felt he had reasonable suspicion to

---

[2] The Commonwealth's Exhibit 1 was a DVD of the dashboard camera footage from Trooper Knott's cruiser.

search the car. *Com. Ex. 1.* Trooper Knott asked [Appellant] for permission to search the vehicle. *N.T. p. 30.*

[Appellant] denied consent to search. *N.T. p. 30.* Trooper Knott told [Appellant] he had sent for a drug-detecting canine. *N.T. p. 31.*

[Appellant] got back inside his car and made no attempt to leave. *N.T. p. 31.* It took forty minutes for the dog to arrive. *N.T. p. 31.* While waiting for the dog to arrive, [Appellant] told the Troopers his son needed to use a bathroom. *N.T. p. 31.* [Appellant] told the Troopers he was going to drive the vehicle away so the child could use the bathroom. *N.T. p. 31.* Trooper Knott told [Appellant] he could not move the vehicle as an investigative detention was in progress. *N.T. p. 31.* Trooper Coletta offered to drive the boy to the Millcreek Mall, a short distance away, or to take the boy into a secluded, grassy area by the vehicles. *N.T. p. 32.* Ultimately, [Appellant] decided not to leave the vehicle. *N.T. p. 32.*

At this point, Trooper Knott told [Appellant] he was free to leave on foot with the child but the vehicle was being detained for a canine search. *N.T. p. 32.*

[Appellant] and his son then proceeded on foot up the off-ramp and never came back. *N.T. [pp.] 31, 32.* The dog arrived, did an exterior sniff and indicated the presence of drugs in the car. *N.T. p. 33.*[3]

Trooper Knott has been a state trooper for approximately twelve years and a municipal police officer for five years. *N.T. pp. 5, 6.* He has performed between 25,000 and 30,000 traffic stops, engaged in drug interdiction training and conducted drug investigations. *N.T. 6, 50.* Trooper Knott has ample experience in narcotics investigations and interdictions during traffic stops.

Suppression Court Opinion, 7/8/14, at 1–4.

_____

[3]  Upon execution of a search warrant, the police found three pounds of marijuana in the trunk of the Impala. N.T. Trial, 1/12/15, at 123–127.

- 4 -

Several days after the traffic stop, Appellant was arrested and charged with possession of a controlled substance and possession of a controlled substance with intent to deliver ("PWID"). Complaint, 8/22/13. Defense counsel filed and argued a suppression motion, which the trial court denied. Motion to Suppress, 4/30/14; N.T. Suppression, 6/2/14; Order, 7/8/14. Appellant proceeded *pro se* with appointed standby counsel. Following a two-day trial, the jury convicted Appellant of both crimes. N.T., 1/13/15, at 196.

The trial court sentenced Appellant to incarceration for twelve to twenty-four months followed by twelve months of state-supervised probation. N.T., 3/13/15, at 50. Appellant filed an untimely *pro se* motion for modification of sentence on March 26, 2015. The next day, Appellant filed a timely *pro se* notice of appeal and a *pro se* Pa.R.A.P. 1925(b) statement of errors complained of on appeal, in which he raised thirty-one issues. Appellant filed a *pro se* amended concise statement on June 1, 2015, in which he raised additional issues, numbered 32–73.[4] The trial court complied with Pa.R.A.P. 1925.

---

[4] Regarding Appellant's amended Rule 1925(b) statement, the trial court opined as follows:

> Appellant raised an additional 42 issues, many of which overlapped or restated the issues raised in his original Concise Statement. Appellant filed his Amended Concise Statement without requesting permission of the Court as required. *See*

*(Footnote Continued Next Page)*

Appellant presents five questions for our consideration, which we reproduce *verbatim* as follows:

(1)  Did the second investigatory detension-then a custodian detention, that was not supported by probable cause and/or reasonable suspicion, violate Appellant's Fourth Amendment and Pennsylvania's Article 1 Section 8's Constitution?

(2)  Was the interior K-9 search in direct violation of the Fourth Amendment and Pennsylvania's Article 1 Section 8's Constitution?

(3)  Did the lower court violate the Appellant's due process, Sixth Amendment and Equal Protection rights to confrontation serveral times during the trial process?

(4)  Was the proof presented at trial sufficient and did it rise to the standard of "beyond a reasonable doubt?

(5)  Was the traffic stop used to create a second stop, that prolonged the initial traffic stop.  That is a constitutionality of a pretextual stop?

Appellant's Brief at 7–8 (reformatted for ease of reading).[5]

_(Footnote Continued)_ ———————————

Pa.C.S.A. 1925(b)(2) (permitting a judge to allow an amended or supplemental Statement to be filed upon application of the appellant and a showing of good cause).  As such, the issues raised in Appellant's Amended Concise Statement have been waived in so far as they do not overlap with issues raised in the original Concise Statement.

Trial Court Opinion, 7/9/15, at 4.

[5]  The trial court concluded that Appellant's seventy-three issues raised on appeal were waived: "Claiming such a voluminous number of redundant errors on appeal hinders the Court's ability to adequately address Appellant's claims.  Consequently, because of the inordinate number of issues raised, the improper form in which they are presented, and the nature of the issues,
_(Footnote Continued Next Page)_

Appellant's issues essentially cover three topics. In issues (1), (2), and (5), Appellant argues the evidence should have been suppressed. In issue (3), Appellant contends his right to confrontation was hindered by the trial court, and in issue (4), Appellant challenges the sufficiency of the evidence. We shall review Appellant's arguments in these contexts.

We address Appellant's sufficiency challenge first because he would be entitled to discharge if the evidence was insufficient to support the verdict. *See Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa. Super. 2013) ("Because a successful sufficiency of the evidence claim warrants discharge on the pertinent crime, we must address this issue first."). Appellant asserts that his convictions were based on speculation and conjecture because "there was no evidence that [he] ever touched the contraband, [k]new it was there or intended to [sell] it." Appellant's Brief at 62 (emphasis omitted). Appellant is incorrect.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for

*(Footnote Continued)* ─────────────

all issues raised on appeal are waived." Trial Court Opinion, 7/9/15, at 5. The trial court then opined, "Assuming *arguendo* Appellant's claims are not waived, the discernable claims will be addressed *seriatim*, to the extent possible." *Id.* at 7. In the interest of judicial economy, we too shall address Appellant's issues, limiting our review to the arguments raised in his appellate and reply briefs.

[that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brown*, 23 A.3d 544, 559-560 (Pa. Super. 2011)

(citation omitted).

The trial court addressed Appellant's sufficiency challenge, as follows:

A review of the record confirms the Commonwealth met its burden of proof with respect to each of the crimes.

**A. Possession of a Controlled Substance**

A person is guilty of the offense of possession of a controlled substance when he "knowingly or intentionally possesses a controlled or counterfeit substance. . .unless the substance was obtained directly from, or pursuant to, a valid prescription order or order of a practitioner, or except as otherwise authorized by this act." 35 [P.S.] §780-113(a)(16).

Possession can be actual or constructive. "Constructive possession has been defined as the ability to exercise a conscious dominion over the illegal substance: the power to control the contraband and the intent to exercise that control." *Commonwealth v. Macolino*, 503 Pa. 201, 206, 469 A.2d 132, 134 (1983).

Appellant was pulled over driving a car that was later discovered to contain three pounds of marijuana. Appellant was the only adult in the car and was in sole control of the car. Trooper Knott testified Appellant likely knew about the marijuana

- 8 -

because he seemed nervous, the car had a strong smell emanating from it, and Appellant's explanation as to why he was in the area was suspect. Appellant argued at trial that because the marijuana was found in the trunk of the car and the car belonged to his nephew, he did not have possession of the marijuana. However, Trooper Knott testified these factors only supported that Appellant knew about the contraband as in his experience, those who transport illegal drugs will often transport the drugs in another individual's car and take actions to have plausible deniability should the drugs be discovered.

The jury viewed the video depicting Appellant's interaction with Trooper Knott numerous times over the course of the trial. The jury obviously found Trooper Knott's testimony to be corroborated by the video and his testimony credible.

The Commonwealth, at closing summed up the final piece of circumstantial evidence that pointed to Appellant's knowledge of the marijuana in the trunk:

* * *

[THE COMMONWEALTH]: Thank you. Trooper Knott tells him, look, the vehicle can't go, we're bringing in a canine. You can go; vehicle stays. Okay? I'm talking about knowledge that drugs are there. He knows the drugs are there because he leaves. He knows that Iggy is going to have a positive indication. If he doesn't know, if [Appellant] doesn't know drugs are in there, he has no clue, according to him shouldn't be any drugs in that car; and he knows that if there's no positive indication of drugs he gets his vehicle, his nephew's vehicle back and he can go about his business. If there's no positive indication, there's no reason for Trooper Knott to keep the car there. But he never comes back.

There is sufficient evidence of record to sustain Appellant's conviction for drug possession.

## B. Possession of a Controlled Substance with Intent to Deliver

As discussed, the Commonwealth presented sufficient evidence for the jury to find Appellant was in possession of the marijuana found in the car he was driving.

"Intent to deliver can be inferred from possession of a large quantity of controlled substances." *Commonwealth v. Jackson*, 645 A.2d 1366, 1368 (Pa.Super. 1994). Other relevant factors include "the manner in which the controlled substance was packaged, the behavior of the defendant, the presence of drug paraphernalia, and large sums of cash." *Commonwealth v. Carpenter*, 955 A.2d 411, 414 (Pa. Super. 2008).

Trooper Knott testified the amount of marijuana found in the car, about 3 pounds, is indicative of intent to deliver. The marijuana was also found in the trunk of the car, not on Appellant's person. No drug paraphernalia or means to ingest the marijuana was found. These facts support the conclusion the marijuana was not possessed for personal use, rather for delivery or distribution.

The Commonwealth therefore sustained its burden of proof regarding each element of possession of a controlled substance with intent to deliver.

Trial Court Opinion, 7/9/15, at 14–17 (some internal citations omitted).

Upon review, we conclude that the record supports the trial court's findings and its legal conclusion is without error. Moreover, we dispose of Appellant's sufficiency challenge by adopting as our own the trial court's well-reasoned analysis set forth above.

Next, we address Appellant's suppression challenge.

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record

as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

*Commonwealth v. Freeman*, ___ A.3d ___, ___, 2016 PA Super 235 at *2

(Pa. Super. 2016) (quoting *Commonwealth v. Ranson*, 103 A.3d 73, 76

(Pa. Super. 2014) (internal citations and quotations omitted)).

Additionally, Pennsylvania jurisprudence recognizes three categories of

interaction between citizens and police officers:

The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention[,]" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Gutierrez*, 36 A.3d 1104, 1107 (Pa. Super. 2012)

(quoting *Commonwealth v. Ellis*, 662 A.2d 1043, 1047 (Pa. 1995)

(citations omitted)).

Appellant concedes the initial traffic stop was legal. Appellant's Brief

at 19. Indeed, the evidence demonstrates that Trooper Knott had probable

cause to believe that Appellant violated the Vehicle Code by having heavily

tinted windows. *See* 75 Pa.C.S. § 4524(e)(1) ("No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle."). However, the record reveals that, after ending the interaction based on the traffic violation, Trooper Knott initiated a second round of questioning with Appellant. N.T. Suppression, 6/2/14, at 28–30. Thus, the inquiry becomes whether this second interaction constituted an investigatory detention and, if so, whether the investigatory detention was supported by reasonable suspicion of criminal activity. *Commonwealth v. Moyer*, 954 A.2d 659, 665 (Pa. Super. 2008) (*en banc*).

Trooper Knott provided the following testimony regarding his termination of the traffic stop and his re-engagement of Appellant:

> Q. Now, at some point did you tell him he was free to go?
>
> A. I didn't exactly use those words. I provided him with a copy of the written warning and explained the violations, and at that point I don't know if we shook hands, but there was a clear line of separation of he was returning to his car and I was still standing there talking to Trooper Coletta.
>
> Q. When you shook his hand, where was he standing?
>
> A. We were at the back of my cruiser and in front of Trooper Coletta's cruiser.
>
> Q. After he got done shaking hands with you, did he go back to his car?
>
> A. He did.

- 12 -

Q.      How did he appear to walk back to his car?

A.      He was walking fast.  He was obviously in a hurry to get on his way.

Q.      Did he get on his way?

A.      No.  At that point when he reached his car I asked him if I might speak to him for a moment.  He agreed.  He remained and spoke to me and I asked him a couple of questions at that point.

Q.      Okay.  At that point did you still believe that there was criminal activity afoot, despite making it known to him that he was going to be leaving?

A.      Absolutely, yes.

Q.      Was it ever your intent for him to leave?

A.      No, it wasn't.

Q.      Why did you give [him] a written warning and it seems like he can go, but then you reengage him?  Why do you do that?

A.      It's just standard practice.  When you have a traffic stop being conducted and you see indicators of criminal activity being present, when you ask someone for consent to conduct the search of the vehicle there are a number of tests and challenges that need to be met, and one of those is to have the person feel that they are free to leave, that the consent was entered into voluntarily.  And one test of that voluntariness is whether the person was free to leave, whether they believed that they were free to leave, whether they demonstrated that they knew they were free to leave.

Q.      Ok.  And that's what you did in this case?

A.      Yes, that's correct.

Q.      Did you ask him for consent to search the vehicle?

A.     I did, yes.

Q.     Did you tell him that you believe – that you thought there might be things illegal in the car, or did you ask him if there was anything illegal in the car?

A.     I did, yes.   He said no, and then I asked for a consent to search.

Q.     Did he give you that consent?

A.     No, no.  He said a number of different things, but he didn't consent to a search.

N.T., 6/2/14, at 28–30.

Given the facts surrounding the subsequent interaction, we conclude that Appellant was subject to a second detention.   As stated above, Appellant was stopped for a lawful detention resulting from the motor vehicle code violation.   Because the trooper had accomplished the purpose of the stop, as indicated by his issuance of a warning and acting in such a manner as to suggest that Appellant was free to go, Appellant would have been within his rights to drive away.  *Accord Commonwealth v. Freeman*, 757 A.2d 903, 907 (Pa. 2000) ("Since the trooper had accomplished the purpose of the stop, as he expressly indicated, [defendant] would have been entirely within her rights to drive away at that point.").

Trooper Knott's subsequent actions, however, were inconsistent with his conduct indicating that Appellant was free to leave.   Trooper Knott returned Appellant's documentation while they were standing at the back of the trooper's cruiser.   After Appellant returned to his car, the trooper

- 14 -

approached Appellant and began to ask him additional questions. Moreover, when Trooper Knott re-engaged Appellant, Appellant remained standing outside of his vehicle. N.T. Suppression, 6/2/14, at 29. We have observed, "[W]hen an individual has been subjected to a valid detention and the police continue to engage that person in conversation, the citizen, having been in official detention, is less likely to understand that he has the right to refuse to answer questions or a search." *Moyer*, 954 A.2d at 665; *see also Commonwealth v. Kemp*, 961 A.2d 1247, 1254 (Pa. Super. 2008) (citing *Moyer*, 954 A.2d at 665). Indeed, Trooper Knott testified that it was always his intention to re-engage Appellant after ending the initial traffic violation stop. N.T. Suppression, 6/2/14, at 29. Thus, we conclude that Appellant was not involved in a mere encounter with Trooper Knott following termination of the traffic stop; rather, he was subjected to an investigatory detention. *See Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa. Super. 2005) ("[W]here the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest."). Accordingly, for this investigative detention to pass constitutional muster, it must be supported by reasonable suspicion of criminal activity.

Appellant avers that the police lacked reasonable suspicion to detain him once the traffic stop was concluded; therefore, the marijuana recovered

from the trunk of the vehicle he was driving should have been suppressed. Appellant's Brief at 18. Specifically, Appellant claims that Trooper Knott failed to "demonstrate cause for suspicion *after* the end of the initial stop **independent** of any basis on which he conducted that stop." Appellant's Brief at 25 (citing *Commonwealth v. Ortiz*, 786 A.2d 261 (Pa. Super. 2001)).

We reject Appellant's position as misinformed regarding the appropriate frame of reference for testing reasonable suspicion.[6] Unlike Appellant's focus on independent factors giving rise to reasonable suspicion after termination of the traffic stop, Pennsylvania case law provides a broader perspective:

> A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. *Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 676 (1999). "This standard, less stringent than probable cause, is commonly known as reasonable suspicion." *Id.* In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163 (2001). In making this determination, we must give "due weight ... to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience." *Cook*, 735 A.2d at 676 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, "[e]ven a combination of innocent facts, when

_____

[6] Although *Ortiz* stands for the proposition advanced by Appellant, we announced in *Kemp* that *Ortiz* "was wrongly decided." *Kemp*, 961 A.2d at 1255.

taken together, may warrant further investigation by the police officer." **Cook**, 735 A.2d at 676.

**Freeman**, \_\_\_ A.3d at \_\_\_, 2016 PA Super 235 at *4 (quoting

**Commonwealth v. Rogers**, 849 A.2d 1185, 1189 (Pa. 2004)).

The suppression court credited Trooper Knott's testimony and analyzed

the totality of the circumstances as follows:

> In this case, Trooper Knott, in light of his experience and training, articulated specific observations and derived reasonable inferences from those observations which provided him with reasonable suspicion. Trooper Knott had extensive experience in detecting indicators of drug trafficking.

> Specifically, Knott observed a vehicle with heavily-tinted windows and an object dangling beneath the vehicle. Tinted windows have historically been used in drug transactions to hide the identity of the vehicle's occupants and the activities therein.

> The car was a borrowed vehicle. Borrowed vehicles are often used so the driver may deny any knowledge of the presence of contraband. *See Com. v. Kemp, supra* at 1254.

> Trooper Knott detected the odor of artificial air fresheners. Air fresheners are used as masking agents. *See Com. v. Rogers*, 849 A.2d 1185 (Pa. 2004).

> Both [Appellant] and his nephew, Thomas Jones, have convictions for drug offenses.

> [Appellant] exhibited unnecessary nervousness considering Trooper [Knott] was only issuing a summary warning for a traffic offense. *See Com. v. Rogers*, 849 A.2d 1185 (Pa. 2004).

> [Appellant] was coming from Farrell, Pennsylvania, an area identified as a source city for drug distribution. *Kemp, supra,* at 1255. In Trooper Knott's view, [Appellant's] explanation of his shopping destination in Erie was not sensible.

> The license plates [sic] for this vehicle were run by a state trooper in Meadville, Pennsylvania in the preceding month of

- 17 -

July. Meadville is approximately halfway between Farrell and Erie. [Appellant] did not accurately state the drive time between Farrell and Erie.

* * *

Though each separate fact may be innocuous in the abstract, the totality of the facts known to or observed by Trooper Knott reasonably permitted a belief [that] criminal activity was afoot. Trooper Knott's observations provided him with reasonable suspicion to detain and search the vehicle.

Suppression Court Opinion, 7/8/14, at 6–7. Upon careful consideration, we agree with the suppression court's decision.

When viewed in isolation, some of the facts Trooper Knott relied upon appear innocuous. However, as we stated in a similar situation:

[w]e would hesitate to hold that a vehicle may be detained for more than an hour and subjected to a canine search merely because it had been rented for a one-way trip from New York to Binghamton, a purported drug destination, or because the driver, when stopped, appeared agitated. But we are required to review the circumstances in their totality, and, upon doing so, we conclude that the evidence was sufficient to support the trial court's determination that the trooper's detention of [a]ppellant was supported by reasonable suspicion.

*Freeman*, ___ A.3d at ___, 2016 PA Super 235 at *7. *Accord Rogers*, 849 A.2d 1185 (applying a totality-of-the-circumstances approach to determining whether an interaction following a valid traffic stop is an encounter or an investigatory detention); *Kemp*, 961 A.2d 1247 (same); *Commonwealth v. Caban*, 60 A.3d 120, 127 (Pa. Super. 2012) (same); *Commonwealth v. Valdivia*, 145 A.3d 1156 (Pa. Super. 2016) (illustrating

how individual facts that may not be suspicious when viewed alone, or by a layperson, may coalesce to form reasonable suspicion).

Guided by the precedent above, we conclude the suppression court did not err in determining that the totality of circumstances in this case supported Trooper Knott's suspicion of criminal activity as reasonable. Therefore, we discern no basis to disturb the denial of Appellant's suppression motion.

Lastly, we address Appellant's claim that the trial court violated his right to confrontation by preventing him from questioning the canine handler. Appellant's Brief at 52. Appellant's argument stems from a strategy to challenge the reliability of the canine that searched his car. *Id.* at 55–57.

"The Confrontation Clause in the Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." *Commonwealth v. Wantz*, 84 A.3d 324, 337 (Pa. Super. 2014) (internal brackets omitted). Whether Appellant's confrontation rights were violated is a pure question of law; therefore, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Yohe*, 79 A.3d 520, 530 (Pa. 2013).

The trial court rejected Appellant's confrontation challenge as follows:

> Appellant argues his right to confrontation was violated when he was unable to call the canine handler as a witness at

trial. The canine handler was not called by the Commonwealth and the Commonwealth presented no evidence that relied on statements made by the canine handler. Therefore, the right to confrontation does not apply in this scenario and Appellant's Sixth Amendment claim is meritless.

Trial Court Opinion, 7/9/15, at 11. Upon review, we agree with the trial court.

The Confrontation Clause does not mandate that the Commonwealth call every potential witness in a case. **Commonwealth v. Gasiorowski**, 310 A.2d 343 (Pa. Super. 1973) (citations omitted). Indeed, "it is not the obligation of the prosecutor in a criminal case to call all the material witnesses to the case, nor even to call the victim." **Id.** at 344. Appellant cannot argue he was denied his right to confront the canine handler where the canine handler was not called as a witness against him and the Commonwealth did not introduce evidence derived from the handler. **Wantz**, 84 A.3d at 337. Appellant's position lacks merit.

Judgment of sentence affirmed.

Judge Olson joins the Memorandum.

Judge Strassburger files a Concurring Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/12/2017